FRANCIS SLUSARSKI ET AL., APPELLANTS, V. AMERICAN CONFINEMENT SYSTEMS, INC., ET AL., APPELLEES.

357 N.W.2d 450

Filed November 2, 1984.    No. 83-624.

Raymond E. Baker and David A. Beck of Baker & Beck, P.C., for appellants.

John E. Sullivan and John J. Sullivan, for appellee Brockman.

Dean N. Hansen, for appellee Coxbill.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

HASTINGS, J.

The plaintiffs brought this action against American Confinement Systems, Inc., a dissolved corporation, and the individual defendants as incorporators, stockholders, directors, or officers of that corporation, seeking damages for breach of contract. The plaintiffs' theory of liability against the individual defendants was that the court should disregard the corporate entity. The court entered judgment in the amount of $28,000 against the corporation and defendant Russell Dalrymple, but in favor of the other individual defendants. The court also refused to award prejudgment interest.

In their appeal the plaintiffs assign as error the failure of the district court to pierce the corporate veil as to the defendants Duane Coxbill and Howard Brockman and hold them liable to the plaintiffs, and the failure to award prejudgment interest.

The general rules which we must apply in determining the issue raised in the first assignment of error are found in *United States Nat. Bank of Omaha v. Rupe*, 207 Neb. 131, 135, 296 N.W.2d 474, 477 (1980):

> A corporation is a legal entity complete and separate from its shareholders and officers. . . . Generally, the shareholders of a corporation are not liable for its debts or other obligations. . . . In equity, the corporate entity may be disregarded and held to be the mere alter ego of a shareholder or shareholders in various circumstances where necessary to prevent fraud or other injustice. . . .
>
> Some of the factors which are relevant in determining to disregard the corporate entity are: (1) Grossly inadequate capitalization; (2) Insolvency of the debtor corporation at the time the debt is incurred; (3) Diversion by the shareholder or shareholders of corporate funds or assets to their own or other improper uses; and (4) The fact that the corporation is a mere facade for the personal dealings of the shareholder and that the operations of the corporation are carried on by the shareholder in disregard of the corporate entity.

The plaintiffs are farmers, and in the spring of 1978 they became interested in acquiring a hog confinement system. An initial proposal was made to them in August of 1978 by P.C.P. Manufacturing, for whom Russell Dalrymple worked. It was shortly after that time that Dalrymple talked to the plaintiffs about going into business on his own to furnish confinement systems. On November 1, 1978, the plaintiffs did enter into a contract with American Confinement through Dalrymple for the purchase of a system, at a cost considerably less than that proposed by P.C.P.

From November 1978 through February 1979 the plaintiffs advanced $56,000 for construction of that unit. However, by mid-July, when work was stopped, the building was only one-fourth to one-half completed. The plaintiffs proceeded to finish the building themselves and paid off various mechanics' liens on the premises.

According to the testimony of defendant Coxbill, it was Dalrymple who initiated the various meetings during the late

summer of 1978 relative to the organizing of American Confinement. The two had met when Dalrymple attempted to sell him a P.C.P. system. His plan seemed to be that the money to run the business would come from customers who would sign up for purchases of the systems. Brockman and Dalrymple met under similar circumstances.

American Confinement Systems, Inc., was incorporated on September 1, 1978. The original single shareholder was Russell Dalrymple. In the latter part of September Brockman and Coxbill became directors and officers of the corporation. Brockman was elected vice president and purchased $1,800 worth of stock in cash. Prior to his election, he had also advanced $1,000 to Dalrymple as a personal loan to help get the company started. He was later repaid the loan with a check for $1,000 drawn by Dalrymple on the account of American Confinement. Coxbill was elected secretary, and he paid $1,200 for stock. Both of these men signed loan guaranties to further finance the corporation, and the two together actually paid in excess of $60,000 on those guaranties.

Francis Slusarski testified that his initial contacts with American Confinement were strictly with Dalrymple. Although inquiry was made as to the financial position of the corporation, the names of the other shareholders and directors were not revealed, and a check with the Better Business Bureau revealed no record of the company.

Although Slusarski did meet again with Dalrymple and Brockman sometime in October, there were only Dalrymple and Slusarski and his wife present when the November 1 contract was signed. Further conversations were had during the month of November, and a $16,000 downpayment was made at a meeting in which only Dalrymple and Slusarski and his wife participated.

In February of 1979 Dalrymple asked the plaintiffs for more money on the contract. On February 7 a check for $30,000 was delivered to Dalrymple. Although Coxbill was present at that meeting, the plaintiffs had no discussion with him. On that occasion a considerable amount of liquor, furnished by the plaintiffs, was consumed. Meetings between Dalrymple and the plaintiffs continued on a once or twice a week basis during the

early part of 1979. The last payment of $10,000 was requested by Dalrymple, and payment was made to him, on February 20, 1979.

Slusarski testified that it was not until December of 1978 or January of 1979 that he knew that Coxbill and Brockman were directors of American Confinement, but he never contacted them about any of his problems. There was no other testimony on behalf of the plaintiffs regarding any contacts with those two defendants.

Slusarski did testify that Dalrymple told him at one time that there were some wealthy men backing his company, that they were millionaires, but they were never identified. It was also Slusarski's testimony that he did not know whether Brockman or Coxbill knew anything about his problems in relation to the building contract.

The record leaves little doubt but that Dalrymple ran the corporation as if he were the sole owner. He was the one who generally signed the checks, and who borrowed and spent the money. He controlled the books of the corporation, and when any of the directors requested to see the books, he told them it was none of their business. He refused to account to the board of directors for the expense money that he paid to himself, and purchased an airplane for the company without board approval.

The plaintiffs argue that both Brockman and Coxbill knew that the corporation was grossly undercapitalized, knew that it was insolvent at the time of the contract with the plaintiffs, were aware of diversion of corporate funds by Dalrymple, and recognized that the corporation was a mere facade for Dalrymple's personal dealings, and, having that knowledge, failed to act to protect the plaintiffs and other customers, and therefore should be held personally liable.

However, reviewing the evidence de novo, as we must, we agree with the trial court that these defendants' apparent inaction in the face of this information nevertheless fell short of active participation in the fraud perpetrated by Dalrymple. The cases we have been cited to from this jurisdiction, as well as those from states other than Nebraska, all seem to involve one person, or a man and wife, who operated a corporation as an

alter ego. See, *United States Nat. Bank of Omaha v. Rupe*, 207 Neb. 131, 296 N.W.2d 474 (1980); *Nebraska Engineering Co. v. Gerstner*, 212 Neb. 440, 323 N.W.2d 84 (1982); *State ex rel. Sorensen v. Weston Bank*, 125 Neb. 612, 251 N.W. 164 (1933); *Gallagher v. Reconco Builders, Inc.*, 91 Ill. App. 3d 999, 415 N.E.2d 560 (1980); *Kilpatrick Bros., Inc. v. Poynter*, 205 Kan. 787, 473 P.2d 33 (1970); *Amoco Chemicals Corporation v. Bach*, 222 Kan. 589, 567 P.2d 1337 (1977).

Generally, equity will disregard the corporate entity only if it is used as a cloak to cover fraud or illegality or to work injustice, or if necessary to achieve equity. *Kilpatrick Bros., Inc. v. Poynter, supra.* Coxbill and Brockman were not active participants in the improper activities of Dalrymple.

Although Brockman felt as early as January or February of 1979 that Dalrymple was not doing a good job, he believed that to remove him from the corporation would have been the end for everyone involved. He got this impression after visiting with Robert McIllece, the president of the primary bank for the corporation. He had known and respected McIllece for a number of years, and it was McIllece's opinion that things could be worked out and American Confinement Systems could be a going company. This is the same bank in whose favor Brockman and Coxbill made good on their loan guaranties.

In addition, it was the testimony of attorney Eugene Foote II, who took over the corporation for a time as a quasi-trustee during the early months of 1979, that he operated for several months on the understanding that he had a viable corporation.

As previously stated, Brockman and Coxbill did not actively engage in fraudulent or illegal acts; and in light of the testimony by the banker and the attorney, they could hardly be said to have been guilty of negligence in their misappraisal of the situation. Considering also the knowledge the plaintiffs had of the unknown stability of the corporation and their failure to rely on the participation of either Coxbill or Brockman as members of the corporation, and the fact that Coxbill and Brockman not only fully paid for their stock but also answered dearly for their loan guaranties, we do not believe that equity requires a result different from that reached by the district court. As to the matter of liability of these two defendants, the

judgment is affirmed.

The second assignment of error relates to the matter of prejudgment interest. "Where a reasonable controversy exists as to the plaintiff's right to recover or as to the amount of such recovery, the claim is generally considered to be unliquidated and prejudgment interest is not allowed." *Land Paving Co. v. D. A. Constr. Co.*, 215 Neb. 406, 407, 338 N.W.2d 779, 780 (1983). Although the liability of the corporation and of Dalrymple was not seriously challenged, the fact that the plaintiffs' claim for damages was in excess of $43,000, whereas the court found from the evidence that it amounted to but $28,000, would seem to establish that there was in fact a reasonable controversy on that score.

The judgment of the district court is affirmed.

AFFIRMED.