J. L. BROCK BUILDERS, INC., A NEBRASKA CORPORATION,
APPELLANT, V. ERIC DAHLBECK, JR., AND VIKING CONSTRUCTION,
INC., APPELLEES.

391 N.W.2d 110

Filed August 1, 1986.    No. 84-961.

Robert F. Martin, P.C., for appellant.

Eric Dahlbeck, Jr., pro se.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

SHANAHAN, J.

Between 1971 and 1977, J. L. Brock Builders, Inc., provided supplies, materials, and services for painting properties owned by Viking Construction, Inc. When Viking failed to pay its account, Brock filed suit in the district court for Douglas County, seeking judgment for $15,895 against Viking and Eric Dahlbeck, Jr., Viking's president and sole shareholder. When Viking admitted liability for the debt of $15,895, judgment was entered for Brock against Viking, and the sole issue submitted to the district court was whether, in disregard of Viking's corporate entity, Dahlbeck was liable for the debt which Viking owed Brock. The district court decided in favor of Dahlbeck and dismissed Brock's action to impose liability on Dahlbeck by piercing Viking's corporate veil.

"In equity, the corporate entity may be disregarded and held to be the mere alter ego of a shareholder or shareholders in various circumstances where necessary to prevent fraud or other injustice." *United States Nat. Bank of Omaha v. Rupe*, 207 Neb. 131, 135, 296 N.W.2d 474, 477 (1980). In *Workman v. Workman*, 174 Neb. 471, 501, 118 N.W.2d 764, 782 (1962), we stated:

> "A court of equity will not permit mere corporate forms to serve as a cloak and a shield to the perpetration of a fraud, but will examine the whole transaction, looking through corporate forms to the substance of things, to protect the rights of innocent parties, or to circumvent fraud."

Proceedings seeking disregard of corporate entity, that is, piercing the corporate veil to impose liability on a shareholder

for a corporation's debt or other obligation, are equitable actions. See, *United States Nat. Bank of Omaha v. Rupe*, *supra*; *Slusarski v. American Confinement Sys.*, 218 Neb. 576, 357 N.W.2d 450 (1984).

An appeal to the Supreme Court in an equitable action is a trial of factual questions de novo on the record, requiring the Supreme Court to reach a conclusion independent of the findings of the trial court. Neb. Rev. Stat. § 25-1925 (Reissue 1985). The Supreme Court's de novo review of the record is subject to the rule that, where credible evidence is in conflict on a material issue of fact, the Supreme Court will consider the fact that the trial court observed the witnesses and accepted one version of facts over another. *American Sec. Serv. v. Vodra*, 222 Neb. 480, 385 N.W.2d 73 (1986).

In 1971 Gail Koch and Dahlbeck incorporated Viking to develop real estate. Viking was capitalized with $3,000, $2,250 in cash by Dahlbeck for 75 percent of the stock and $750 in services by Koch for 25 percent of the stock. At the first meeting of the board of directors, a $7,000 loan from Dahlbeck to Viking was approved. Viking's capital account never changed throughout its existence. Viking developed two South Omaha subdivisions involving 65 lots, 25 of which cost $10,000 each, with the remaining 40 at $4,500 an acre. Federal income tax returns for Viking were introduced into evidence. During its first 4 years, Viking had average real estate sales of $1,259,260. From 1975 to 1978, however, Viking's sales decreased from $458,393 to $169,432. Other annual averages throughout Viking's existence included a net operating loss—$9,519, accounts payable—$147,072, assets—$738,794, and liabilities—$833,312. According to balance sheets accompanying Viking's federal income tax returns, Viking's average liabilities at book value throughout its existence exceeded its average assets at book value.

In 1972 Viking paid $15,000 salaries to Dahlbeck, as president, and Koch, as secretary-treasurer, of the corporation. Dahlbeck's salary in 1973 was $5,750, while Koch's was $13,000. In 1974 Dahlbeck and Koch each received a salary of $2,500. Viking paid no salaries from 1975 to 1978. Koch severed his relationship with Viking as an officer and

shareholder in 1976, and his stock was bought by Viking and reported as treasury stock on its financial statements.

On January 11, 1977, on behalf of Viking, Dahlbeck wrote a letter to the corporation's creditors:

> Even with the activity that we have at the present time, it will be at least April or May before we will have any cash flow with which to pay any old accounts. At that time, I am sure we will be able to resume some kind of a reasonable payment schedule. Until then we are still hanging on by our fingernails. Let's all hope no one clips them off.

When Viking's business continued to decline during the remainder of 1977, Brock made a demand for payment. Early in 1978, Viking commenced winding up its business and, on March 31, transferred assets valued at $11,000, its entire net worth, to Dahlbeck in satisfaction of his loans to the corporation. At the time of the transfer of assets to Dahlbeck, Viking owed other creditors, including Brock, $78,000. Viking made its last payment to Brock in April 1978, leaving a balance of $15,895 owed on the debt to Brock. In July, Viking notified homeowners that it would no longer be able to do work or make repairs on houses acquired from the corporation. On November 2 Dahlbeck assigned his personal assets, which included property he had received from Viking on March 31, to a bank in partial payment of a loan to Viking for which Dahlbeck was the guarantor.

After Viking dissolved in 1980, Brock filed suit, alleging that Dahlbeck had used Viking's assets for his personal purposes and had thereby defrauded Brock as one of Viking's creditors.

Brock presented testimony from an expert, Gilbert Ragan, an accountant and a professor of accounting and economics. Ragan expressed an opinion that Viking was "grossly inadequately capitalized for the size of its operation" and that the purpose of capitalization for $3,000 was a "liability shield." Although he acknowledged that it was not unusual for a home developer to enter business somewhat undercapitalized, Ragan testified that he did not recall any developer, with sales as extensive as Viking's, going into business with "just $3,000 worth of capital." Referring to a home construction business

such as Viking's, Ragan testified the industry standard called for a net equity ratio (ratio of corporate debt to net corporate equity) of 61.2 percent, that is, $612 of debt for every $1,000 of equity. For Viking the net equity ratio was zero percent. Concerning his examination and analysis of Viking's books, Ragan testified that Dahlbeck had received preferential treatment as one of Viking's creditors because the transfer of Viking's assets to Dahlbeck had "cleaned out the assets of Viking . . . . They did have remaining at that particular time other creditors, accounts payable of $78,000." According to Ragan, throughout its corporate existence, Viking was insolvent.

On the subject of Viking's capitalization, Dahlbeck testified, "We didn't feel like we needed to put a lot more, and I guess when we originally capitalized we didn't have a lot more." Dahlbeck also testified he had "at one point . . . $105,000 of [his] own personal cash invested in Viking" but that "it was considered a loan." There is no documentary evidence of any Viking debt to Dahlbeck. Dahlbeck testified that the transfer of Viking's assets to him actually reduced the number of contractors and suppliers who would have been unpaid, especially if Viking were forced into bankruptcy. Dahlbeck admitted that Viking continued to incur debts, although Viking's debts exceeded its assets. Dahlbeck admitted that, notwithstanding the corporation's knowledge of its insolvency from the time of its incorporation, Viking continued its operations in land development.

In *Scribner Grain & Lumber Co. v. Wortman*, 204 Neb. 92, 94, 281 N.W.2d 394, 395-96 (1979), we stated:

" '[A] corporation will be looked upon as a legal entity as a general rule, and until sufficient reason to the contrary appears; but, when the notion of a legal entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime, the law will regard the corporation as an association of persons.' "

See, also, *Southwest Bank of Omaha v. Moritz*, 203 Neb. 45, 277 N.W.2d 430 (1979). In *George v. Board of Education*, 210 Neb. 127, 129, 313 N.W.2d 259, 261 (1981), we held: "[The] corporate identity is disregarded only where the corporation

has been used to commit fraud, violate a legal duty, or perpetrate a dishonest or unjust act in contravention of the rights of another." See, also, *Slusarski v. American Confinement Sys.*, 218 Neb. 576, 357 N.W.2d 450 (1984).

A creditor, seeking to pierce the corporate veil and impose on a shareholder liability for a corporation's debt, has the burden to show, by a preponderance of evidence, that corporate entity must be disregarded to prevent fraud or injustice to the creditor. *North Arlington Med. v. Sanchez Constr.*, 86 Nev. 515, 471 P.2d 240 (1970).

Fraud may be proved by circumstantial evidence. *Alliance Nat. Bank v. State Surety Co., ante* p. 403, 390 N.W.2d 487 (1986). We stated in *United States Nat. Bank of Omaha v. Rupe*, 207 Neb. 131, 296 N.W.2d 474 (1980): "Some of the factors which are relevant in determining to disregard the corporate entity" on the basis of fraud are:

(1) Grossly inadequate capitalization; (2) Insolvency of the debtor corporation at the time the debt is incurred; (3) Diversion by the shareholder or shareholders of corporate funds or assets to their own or other improper uses; and (4) The fact that the corporation is a mere facade for the personal dealings of the shareholder and that the operations of the corporation are carried on by the shareholder in disregard of the corporate entity.

*Id.* at 135, 296 N.W.2d at 477. See, also, *Nebraska Engineering Co. v. Gerstner*, 212 Neb. 440, 323 N.W.2d 84 (1982); *Slusarski v. American Confinement Sys., supra.*

The circumstances or factors to determine existence of fraud, as suggested in *United States Nat. Bank of Omaha v. Rupe, supra*, are analogous to the "badges, signs, indicators, or indicia of fraud" examined in *Gifford-Hill & Co. v. Stoller*, 221 Neb. 757, 763, 380 N.W.2d 625, 630 (1986):

" '[B]adges of fraud' . . . are said to be facts which throw suspicion on a transaction, and which call for an explanation. . . . More simply stated, they are signs or marks of fraud. They do not of themselves or per se constitute fraud, but they are facts having a tendency to show the existence of fraud, although their value as evidence is relative not absolute. They are not usually

conclusive proof; they are open to explanation. They may be almost conclusive, or they may furnish merely a reasonable inference of fraud, according to the weight to which they may be entitled from their intrinsic character and the special circumstances attending the case. Often a single one of them may establish and stamp a transaction as fraudulent. When, however, several are found in the same transaction, strong, clear evidence will be required to repel the conclusion of fraudulent intent . . ." [Citing and quoting from *Montana Nat. Bank v. Michels*, ____ Mont. ____, 631 P.2d 1260 (1981).]

As expressed in *Gifford-Hill, supra* at 764, 380 N.W.2d at 630: "Although the 'badges of fraud' may not be conclusive and may be strong or weak according to the nature and number involved in a particular transaction, concurrence of several such badges provides a strong inference of fraud."

Characteristics of inadequate capitalization were suggested in *J-R Grain Co. v. FAC, Inc.*, 627 F.2d 129, 135 (8th Cir. 1980), when the court stated:

" 'Inadequate capitalization' . . . means capitalization very small in relation to the nature of the business of the corporation and the risks the business necessarily entails. Inadequate capitalization is measured at the time of formation . . . . A corporation that was adequately capitalized when formed but has suffered losses is not undercapitalized. . . . [Undercapitalization] presents a question of fact that turns on the nature of the business of the particular corporation." . . .

. . . [T]he general rule [is] that inadequate capitalization is a factor to be considered in determining whether to disregard the corporate entity.

A corporation's financial responsibility to creditors affected by the corporation's inadequate capitalization is discussed in 1 W. Fletcher, Cyclopedia of the Law of Private Corporations § 44.1 at 528 (rev. perm. ed. 1983):

The attempt to do corporate business without providing any sufficient basis of financial responsibilities to creditors . . . will be ineffectual to exempt the stockholders from corporate debts. . . . [S]tockholders should in good

faith put at the risk of the business unencumbered capital reasonably adequate for its prospective liabilities. If the capital is illusory or trifling compared with the business to be done and the risks of loss, this is ground for denying the separate entity privilege.

An examination of the facts and circumstances of this case discloses Viking was grossly inadequately capitalized at the time of its formation. Viking's capital was $3,000 at formation and it had as an asset 65 lots, 25 at $10,000 each and the remaining 40 at $4,500 an acre. The scale of operations anticipated by both the number of lots and their value cannot be adequately capitalized by $3,000. The risk to creditors must be balanced by the availability of more capital should the corporation fail. In reaching our conclusion that Viking was grossly inadequately capitalized, we note Dahlbeck could have provided more capital to Viking at its formation, but chose instead to loan Viking $7,000. However, inadequate capitalization, by itself, is insufficient to prove fraud. See, *J-R Grain Co. v. FAC, Inc., supra*; *North Arlington Med. v. Sanchez Constr., supra*. While inadequate capitalization is a factor to be considered in determining whether fraud exists to warrant disregard of corporate entity, it is further necessary to consider the other circumstances or factors suggested in *United States Nat. Bank of Omaha v. Rupe*, 207 Neb. 131, 296 N.W.2d 474 (1980).

In determining whether Viking was insolvent at the time it became indebted to Brock, see *United States Nat. Bank of Omaha v. Rupe, supra*, the Nebraska Business Corporation Act provides a definition of insolvency, namely, the "inability of a corporation to pay its debts as they become due in the usual course of its business, or an excess of liabilities of the corporation over its assets at a fair valuation." Neb. Rev. Stat. § 21-2002(15) (Reissue 1983). Whether insolvency exists is usually a question of fact. See 15A W. Fletcher, Cyclopedia of the Law of Private Corporations § 7365 (rev. perm. ed. 1981). In the letter to creditors on January 11, 1977, Dahlbeck, on behalf of Viking, acknowledged that corporate cash-flow was insufficient to pay accounts which were due. Dahlbeck testified that Viking continued to operate and incur debts, even though it was insolvent from the time of incorporation, and that

Viking's liabilities exceeded its assets. Professor Ragan testified that, from an accountant's point of view, Viking was insolvent throughout its existence. All the evidence demonstrates that Viking was unable to pay its debts as they became due in the usual course of Viking's business and was, therefore, insolvent. See Nebraska Business Corporation Act, § 21-2002(15). We can reach no conclusion other than Viking's insolvency throughout its existence. A second factor suggested in *Rupe*, namely, corporate insolvency when the debt is incurred, has been established.

Concerning diversion of corporate funds or assets to the personal or improper use of a shareholder, preventing payment of corporate debts:

> Stockholders of an insolvent corporation cannot participate in the distribution of its assets until the claims of creditors are paid. If the assets or capital are distributed to stockholders, either directly or indirectly, or if the stockholders are allowed to withdraw assets leaving creditors unpaid, they may be compelled to repay what they have received, at the suit of creditors . . . at least to the extent necessary to realize the ratable liability of each stockholder for corporate debts, if the company has not retained sufficient assets to pay its debts . . . .

> The withdrawal of assets leaving debts unpaid is contrary to fundamental principles and has been designated as a fraud on creditors.

15A W. Fletcher, *supra* at § 7417 at 137. See *Blocker v. Drain Line Sewer & Water Co.*, 5 Ill. App. 3d 289, 292, 282 N.E.2d 207, 209 (1972) (" 'A corporation has no right to give away its property, leaving its creditors unpaid and not provided for, and any transfer of its assets not made in the usual course of business, and for value, will be set aside . . . .' "); cf. *Gifford-Hill & Co. v. Stoller*, 221 Neb. 757, 762, 380 N.W.2d 625, 629 (1986) (regarding "conveyances to defraud creditors," Neb. Rev. Stat. §§ 36-401 et seq. (Reissue 1978), "[w]hen a debtor intentionally withdrew executable assets from the reach of process, such transactions were characterized as fraudulent to the creditors of that debtor").

Although he was aware of $78,000 in debts to Viking's

suppliers and subcontractors, Dahlbeck, as Viking's sole shareholder, transferred all Viking's assets to himself, resulting in preferential payment to the detriment of Viking's recognized creditors. Preferential treatment in distribution of Viking's total assets prevented even partial payment to Viking's known creditors. The presence of a transaction where corporate funds or assets are diverted to the personal or improper use of a shareholder is not per se fraudulent, but may give rise to an inference of fraud. Dahlbeck's action constitutes an improper use of corporate funds, an injustice perpetrated by a shareholder, thus establishing the third circumstance or factor suggested in *Rupe* (diversion of corporate funds or assets).

The evidence does not support a conclusion that Dahlbeck used Viking as a mere facade for his personal dealings or that Viking's operations were conducted by Dahlbeck in disregard of Viking's corporate entity, the fourth factor found in *United States Nat. Bank of Omaha v. Rupe,* 207 Neb. 131, 296 N.W.2d 474 (1980). As expressed in 1 W. Fletcher, Cyclopedia of the Law of Private Corporations § 41.10 at 397-98 (rev. perm. ed. 1983):

[W]hen the corporation is the mere alter ego, or business conduit of a person, it may be disregarded. . . .

. . . .

Whenever one in control of a corporation uses that control, or uses the corporate assets, to further his or her own personal interests, the fiction of the separate corporate identity may properly be disregarded. . . . [The moving party's] burden of proof is not met by simply alleging a pattern of corporate transaction, rather, some concrete evidence of ownership or interest must be alleged and established showing that the separate personalities of the corporation and the individual no longer exist. Mere domination and control of the corporation by the sole or principal stockholder, who is entitled to all of the corporation's profits, does not make the stockholder personally liable.

Evidence did not establish that Dahlbeck and Viking ceased their separate existence, as it were, so that the interests of Viking became the interests of Dahlbeck. There was no unity of

interest as far as Dahlbeck and Viking were concerned. As the Supreme Court of Iowa expressed in *Northwestern Nat. Bank of Sioux City v. Metro Ctr.*, 303 N.W.2d 395, 398 (Iowa 1981): "The separate-entity concept of the corporation may be disregarded 'under exceptional circumstances, for example, where the corporation is a mere shell, serving no legitimate business purpose, and used primarily as an intermediary to perpetuate fraud or promote injustice.' "

However, we conclude that there is sufficient evidence establishing three of the four factors set forth in *United States Nat. Bank of Omaha v. Rupe, supra,* that is, grossly inadequate capitalization, insolvency of the debtor corporation at the time the debt is incurred, and diversion by a shareholder of the corporate funds or assets to the shareholder's own use. Such factors, as set forth in *Rupe,* are "some of the factors" relevant in determining whether to disregard corporate entity. Establishing three of the four factors suggested in *United States Nat. Bank of Omaha v. Rupe, supra,* is sufficient for our conclusion that Viking's corporate existence was used to commit a fraud upon Brock and that Viking's corporate entity should be disregarded and liability imposed on Dahlbeck for the debt incurred by Viking. Therefore, we reverse the judgment of the district court and remand this matter to the district court with direction to enter judgment in the amount of $15,895 in favor of Brock against Dahlbeck.

REVERSED AND REMANDED WITH DIRECTION.

KRIVOSHA, C.J., dissenting.

I must respectfully dissent from the majority opinion in this case. In my view the majority has reached an improper conclusion and is in error in reversing the decision of the district court. In reaching its conclusion the majority quotes from *Scribner Grain & Lumber Co. v. Wortman*, 204 Neb. 92, 94, 281 N.W.2d 394, 395-96 (1979), wherein we stated:

" '[A] corporation will be looked upon as a legal entity as a general rule, and until sufficient reason to the contrary appears; but, when the notion of a legal entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime, the law will regard the corporation as an association of persons.' "

I am unable to find any evidence in this record to justify a conclusion that the formation and operation of Viking Construction, Inc., were used to defeat public convenience, justify wrong, protect fraud, or defend crime. We recently said in *ServiceMaster Indus. v. J.R.L. Enterprises, ante* p. 39, 43, 388 N.W.2d 83, 86 (1986), that " 'where fraud is committed by a corporation it is time to disregard the corporate fiction and hold the persons responsible therefor in their individual capacities.' " Since the majority has made a factual finding that Dahlbeck in no way intended to use Viking as a vehicle for protecting himself, but was merely guilty of being an imprudent businessman, I am at a loss to understand why we have chosen to disregard the corporation and hold the sole stockholder personally liable.

The majority notes: " 'Some of the factors which are relevant in determining to disregard the corporate entity' on the basis of fraud are:"

(1) Grossly inadequate capitalization; (2) Insolvency of the debtor corporation at the time the debt is incurred; (3) Diversion by the shareholder or shareholders of corporate funds or assets to their own or other improper uses; and (4) The fact that the corporation is a mere facade for the personal dealings of the shareholder and that the operations of the corporation are carried on by the shareholder in disregard of the corporate entity.

I do not believe the evidence justifies our reaching a conclusion that simply by adding up evidence in support of the factors, we may conclude that the immunity against suit granted by Nebraska statute to the shareholders of a corporation should be disregarded.

In the first instance, while there was evidence that the corporation was grossly inadequately capitalized, there was further evidence by the plaintiff's own witness that such undercapitalization was not unusual. One is inclined to believe that a host of small corporations are regularly incorporated and undercapitalized and that few, if any, home construction businesses could meet the expert's "industry standard" of a net equity ratio of 61.2 percent. Furthermore, the evidence establishes that, in addition to the paid-in capital, Dahlbeck

loaned the corporation an additional $7,000, not uncommon or evidence of an intent to create a sham corporation.

Regarding the second factor, insolvency of the debtor corporation at the time the debt is incurred, while the evidence does support the conclusion that Viking's average liabilities at book value throughout its existence exceeded its average assets at book value, the evidence is further uncontradicted that throughout the time that Viking was in existence and had sales, a period of about 8 years, it did pay its bills, though not always on time and not always in the full amount, similar to a host of other corporations doing business.

With regard to the third factor, diversion by the shareholder or shareholders of corporate funds or assets to their own or other improper uses, the evidence establishes that Dahlbeck did cause Viking to transfer to Dahlbeck some $11,000 in assets. The assets, however, did not remain with Dahlbeck but, rather, were immediately thereafter transferred to a creditor of the corporation. To therefore suggest that Dahlbeck should be personally liable for $15,895 as a result of having transferred $11,000 worth of assets out of the corporation and to a creditor, when, had he simply transferred the assets to the creditor in the first instance, no personal liability would attach, is difficult to understand. At most, one would be inclined to believe that Dahlbeck should not be liable for more than the amount of the assets that were transferred.

The most significant factor, however, is the majority's conclusion regarding the fourth factor, that Dahlbeck did not use Viking as a mere facade for his personal dealings or that Viking's operations were conducted by Dahlbeck in disregard of Viking's corporate entity. This corporation was not a mere alter ego or business conduit of the stockholders, as was the case in *Nebraska Engineering Co. v. Gerstner*, 212 Neb. 440, 323 N.W.2d 84 (1982), cited by the majority. It was a legitimate corporation that went broke. It happens all the time. The evidence establishes that large salaries were never paid, and in fact for several years no salaries were paid to the officers. Each of the creditors, including the appellant, dealt with Viking Construction, Inc., with full knowledge that he was dealing with a corporation having limited liability. In view of the

majority's finding that the corporation was not a facade, I believe it inappropriate to "pierce the corporate veil," as the majority has directed, absent evidence of an intent to create a corporation for a fraudulent purpose.

I find the instant case like the facts in *Slusarski v. American Confinement Sys.*, 218 Neb. 576, 357 N.W.2d 450 (1984), where we refused to impose personal liability on two stockholders because the evidence failed to disclose that they actually participated in fraudulent or illegal acts. The "badges of fraud" attributed to Dahlbeck are no different than those which can be found in any business going broke.

Although the facts are somewhat different, I believe that a comparison of this case with our recent decision in *ServiceMaster Indus. v. J.R.L. Enterprises, ante* p. 39, 388 N.W.2d 83 (1986), now leaves the state of corporate law in utter confusion and raises serious questions as to whether anyone can rely upon the protection afforded by incorporation. I would have affirmed the decision of the district court.