IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

JONES V. SLEPER

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

JUSTIN JONES, APPELLEE,

V.

SHERMAN D. SLEPER, APPELLANT.

Filed March 17, 2026.    No. A-25-283.

Appeal from the District Court for Douglas County: JEFFREY J. LUX, Judge. Reversed in part, vacated in part, and remanded with directions.

M. Brett Ryan and James A. Watson, of Watson & Ryan, P.L.C., for appellant.

Spencer R. Murphy, Nicholas A. Buda, and Alexandra M. Speakar, of Baird Holm, L.L.P., for appellee.

MOORE, BISHOP, and WELCH, Judges.

WELCH, Judge.

### INTRODUCTION

Sherman D. Sleper appeals from the Douglas County District Court's order granting summary judgment in favor of Justin Jones in Jones' action to pierce the corporate veil of Sleper's residential construction business and hold Sleper personally liable to Jones. Sleper's sole assignment of error is that the district court erred in piercing the corporate veil of his construction corporation to hold him personally liable. For the reasons stated herein, we reverse in part, vacate in part, and remand with directions.

### STATEMENT OF FACTS

Sleper owned and operated Encore Design & Construction, Inc. (Encore), which was established in 2006 as a residential construction business. In January 2022, Encore and Jones

entered into a contract wherein Encore agreed to renovate Jones' residence for $217,740. The renovation project began in January 2022 and was to be completed within 100 days. The parties amended the agreement twice, increasing the total contract price to $231,467.95. Between January 2022 and December 2022, Jones paid Encore a total of $211,767 for the renovation project; however, in mid-December 2022, Sleper informed Jones that Encore could not complete the construction contract and that Encore was insolvent and would be dissolved. At Jones' request, in January 2023, Sleper provided Jones with an accounting history for Jones' renovation project that indicated that Encore paid $121,965.30 to complete various renovations, but that $23,758.65 was owed to subcontractors, and $55,840 of the contracted work had not been completed. Sleper's accounting did not account for $89,801.70 of the $211,767 total funds paid by Jones to Encore for the project. At some point thereafter, Sleper indicated that Encore did not have the funds to pay the subcontractors resulting in two of the unpaid subcontractors obtaining construction liens on Jones' residence. Jones eventually hired another general contractor to complete the remainder of unfinished renovations for an estimated cost of $133,000.

In July 2023, Jones obtained a default judgment against Encore for $246,560.35 plus prejudgment interest of $89,801.72. Thereafter, Jones filed the present complaint seeking to pierce Encore's corporate veil and hold Sleper personally liable for the judgment. As relevant to this appeal, Jones' complaint alleged that Jones and Encore entered into a contract, which was subsequently amended by two change orders, wherein Encore agreed to complete renovations on Jones' residence for $226,850; that on December 16, 2022, Sleper called Jones and informed him that Encore was insolvent and could not complete any further work; that an accounting provided by Sleper in January 2023 accounted for only $121,965.30 of the $211,767 paid to Encore by Jones for the project; that Encore failed to pay $23,758.65 to various subcontractors who performed work on Jones' residence; that $113,560.35 in funds paid by Jones were misappropriated by Sleper; that Sleper commingled his personal funds with Encore's business funds and otherwise operated Encore in disregard of corporate formalities; that Encore was inadequately capitalized; and that Encore was insolvent. Jones requested that the court hold Sleper personally responsible for the $336,362.07 judgment against Encore plus prejudgment interest, postjudgment interest, and costs of the action; attach the judgment as a lien on Sleper's personal residence or any proceeds from the sale of that residence, or alternatively that Sleper be restrained from selling his residence or disposing of the proceeds; and for any such further relief that the court deemed just.

In his answer, Sleper admitted that he was the sole shareholder and president of Encore and that Jones and Encore entered into a residential construction contract for the specified amount, but he otherwise generally denied the allegations in Jones' complaint. Sleper asserted that Jones' complaint failed to state a claim for which relief could be granted; that Jones failed to mitigate damages; that at all relevant times, Jones knew that he was doing business with Encore; and that at all relevant times, Jones was aware of Sleper's medical condition and when the condition manifested.

Sleper and Jones filed competing motions for summary judgment asserting that there was no genuine dispute of material facts and each asserted that they were entitled to judgment as a matter of law. A hearing on the competing motions for summary judgment was held in October 2024. The parties provided briefs in support of their respective arguments and statements of undisputed facts. Evidence admitted during the hearing included the initial renovation contract, the two contract change orders, Jones' default judgment against Encore, the parties' depositions,

and sworn affidavits of the parties. The parties generally acknowledged that they did not dispute the underlying facts or the applicable law for piercing the corporate veil but rather they disputed whether the facts were sufficient to establish that the factors for piercing the corporate veil had been satisfied as a matter of law.

The record reveals that the parties agreed that they entered into a construction contract to renovate Jones' home in January 2022; that Sleper suffered a stroke on July 31, 2022, and suffered from blood clots on September 1, each resulting in hospitalization; that Sleper informed Jones in December 2022 that he could not complete the renovation project and that Encore would be ceasing business operations; that Jones paid Sleper $211,767 under the contract between January and December 2022; that Encore was unable to complete the project; that Encore utilized $89,801.70 of the $211,767 in funds paid by Jones to Encore to pay bills or other creditors of Encore for other projects in order to stay solvent; that Encore paid Sleper compensation following his hospitalizations; that Sleper received a shareholder distribution in 2022 from Encore; that two subcontractors placed property liens on Jones' residence after Encore failed to pay them for services rendered; that during the 15-year period that Encore was in business as a general contractor, Sleper paid his creditors and other bills as they came due; and that at the time the default judgment was entered against Encore, Encore was insolvent, was no longer in business, and did not own any assets.

During the hearing, Jones argued that Sleper, as the sole owner, officer, shareholder, and employee of Encore, was in sole control of Encore's business operations; that Sleper misappropriated funds paid by Jones to Encore when Encore was insolvent; that Sleper took disbursement of corporate assets in 2022 despite owing debts to the detriment of Encore's creditors; that Sleper failed to observe basic corporate formalities; that Sleper diverted approximately $113,000 of funds paid by Jones to pay Encore's creditors or make shareholder distributions; and that in September 2022, after his stroke, Sleper sought additional payments from Jones for project renovations and subsequently received two additional payments from Jones in October and November 2022. Jones testified that Sleper's statements that he could not work on Jones' project following his stroke were inaccurate as Sleper continued to work on the project until December 2022, until Sleper told Jones that Encore could not complete the project and would be dissolved.

In his deposition and brief in support of summary judgment, Sleper indicated that he operated Encore for 15 years and that Encore was solvent at all times prior to and during the execution of the contract with Jones. Sleper testified that between 2006 and 2022, Encore remained in good standing and maintained a current Nebraska general contractor's license. Sleper stated that he served as Encore's sole owner and employee, and Sleper's personal residence functioned as Encore's primary place of business. Sleper acknowledged that Encore operated informally in that it did not hold annual shareholder meetings; it did not own office space, separate vehicles, or equipment; and it did not generally issue invoices or pay applications. Sleper stated that Encore's business operation only ceased due to his inability to continue working following his stroke and his other health complications and the resulting lack of income. Sleper argued that he did not divert or utilize Encore's assets for his own personal benefit; that Sleper's use of his personal income was "hardly the actions of someone looking to perpetuate a fraud"; that his business practice of using existing funds to pay bills as they came in, although perhaps a bad business strategy, was not for his personal benefit or a means to commit fraud; and that there was no evidence that Encore

was merely a facade for Sleper's personal dealings as evidenced by his legitimate 15-year business operation that only ceased due to his medical complications. In his deposition, Sleper acknowledged that his clients probably expected that the funds that were paid to him went towards their contracts and that Encore had no intention to pay Jones because Encore did not have the assets to pay the judgment.

Following the hearing, on October 24, 2024, the district court found that neither party produced evidence suggesting that Encore was inadequately capitalized when it was incorporated in 2006 but that the evidence supported a finding that Encore was "insolvent at the time the Jones debt was incurred"; that Sleper diverted corporate funds for an improper use in that he "created a Ponzi-like scheme in which he used funds from new clients to pay bills from old clients in order to keep his corporation solvent"; that Sleper failed to retain sufficient funds to fund Encore; that Sleper's actions amounted to "blatant fraudulent use of funds that were entrusted to Encore and Sleper"; that there was evidence that "Encore was simply the alter ego of Sleper"; and that Encore failed to maintain corporate formalities. The court concluded that these findings supported piercing the corporate veil, granted Jones' motion for summary judgment, and denied Sleper's competing motion for summary judgment.

On November 4, 2024, Sleper filed a motion to reconsider. Although the matter was set for a hearing, it was canceled at Sleper's request and was not rescheduled. Thereafter, in March 2025, Jones filed a motion to modify and clarify the court's order to address specific prayers for relief that had been raised in his original complaint.

On April 3, 2025, the district court granted the motion to modify and entered judgment finding that Sleper was personally liable in the amount of $336,362.07, plus prejudgment interest at a rate of 12 percent per annum from July 24, 2023, to the date of its order, postjudgment interest, and costs of the action; directed the clerk to issue payment to Jones in the amount of $177,565.04 from proceeds from the sale of Sleper's residence that was held by the court; and entered judgment in favor of Jones for the remaining $158,797.03. Sleper has appealed from the district court's order granting summary judgment in favor of Jones and entering judgment against Sleper.

ASSIGNMENT OF ERROR

Sleper's sole assignment of error is that the district court erred in piercing the corporate veil of Encore to hold Sleper liable.

STANDARD OF REVIEW

An appellate court reviews the district court's grant of summary judgment de novo, viewing the record in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *407 N 117 Street v. Harper*, 314 Neb. 843, 993 N.W.2d 462 (2023). An appellate court independently reviews questions of law decided by a lower court. *Id.*

Proceedings seeking disregard of a corporate entity, that is, piercing the corporate veil to impose liability on a shareholder for a corporation's debt or other obligation, have previously been referred to as equitable actions. *Perkins v. RMR Building Group*, 320 Neb. 707, 30 N.W.3d 148 (2026). However, piercing the corporate veil is an equitable remedy, not an action in itself. *Id.*

In this appeal, the only issue is whether it was proper for the district court to pierce the corporate veil of Encore to hold Sleper personally responsible for the judgment in favor of Jones. Accordingly, we treat the matter as one in equity. In an appeal of an equity action, an appellate

court tries factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court; provided, where the credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Id.*

ANALYSIS

Before considering the merits of this appeal, we briefly address the standard for summary judgment.

Summary judgment is proper only when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *407 N 117 Street v. Harper, supra.* The pleadings frame the issues to be considered on a motion for summary judgment—one of the primary purposes of summary judgment is to pierce the allegations in the pleadings and show conclusively that the controlling facts are other than as pled. *Id.*

Here, Sleper does not assign or argue that the resolution of the case on summary judgment was improper. In fact, the parties do not dispute the factual circumstances of the case; rather, they only dispute whether, as a matter of law, the facts supplied in the record were sufficient to allow the court to pierce the corporate veil of Encore and render Sleper personally liable for Encore's legal obligation to Jones. More specifically, Sleper argues that the district court erred in the "misreading of the criteria to pierce the corporate veil" and finding that Sleper's actions qualified as fraud or an unjust act sufficient to pierce Encore's corporate veil. Brief for appellant at 7. Therefore, we consider only whether the undisputed facts in this record support the court's judgment.

In *407 N 117 Street v. Harper*, 314 Neb. 843, 849-50, 993 N.W.2d 462, 469-70 (2023), the Nebraska Supreme Court, in addressing the standard for piercing the corporate veil, stated:

> Generally, a corporation is viewed as a complete and separate entity from its shareholders and officers, who are not, as a rule, liable for the debts and obligations of the corporation. A court will disregard a corporation's identity only where the corporation has been used to commit fraud, violate a legal duty, or perpetrate a dishonest or unjust act in contravention of the rights of another. A corporation's identity as a separate legal entity will be preserved, as a general rule, until sufficient reason to the contrary appears.
>
> . . . .
>
> A plaintiff seeking to pierce the corporate veil must allege and prove that the corporation was under the actual control of the shareholder and that the shareholder exercised such control to commit a fraud or other wrong in contravention of the plaintiff's rights. In determining whether to disregard the corporate entity on the basis of fraud, we consider the following factors: (1) grossly inadequate capitalization, (2) insolvency of the debtor corporation at the time the debt is incurred, (3) diversion by the shareholder or shareholders of corporate funds or assets to their own or other improper uses, and (4) the fact that the corporation is a mere facade for the personal dealings of the shareholder and that the operations of the corporation are carried on by the shareholder in disregard of the corporate entity.

Whether these factors exist is a material factual issue. *Victory Lake Marine v. Velduis*, 9 Neb. App. 815, 621 N.W.2d 306 (2000). A creditor, seeking to pierce the corporate veil and impose on a shareholder liability for a corporation's debt, has the burden to show, by a preponderance of evidence, that the corporate entity must be disregarded to prevent fraud or injustice to the creditor. *J. L. Brock Bldrs., Inc. v. Dahlbeck*, 223 Neb. 493, 391 N.W.2d 110 (1986), abrogated on other grounds, *Perkins v. RMR Building Group*, 320 Neb. 707, 30 N.W.3d 148 (2026). However, a court of equity will not permit mere corporate forms to serve as a cloak and a shield to the perpetration of a fraud, but will examine the whole transaction, looking through corporate forms to the substance of things, to protect the rights of innocent parties, or to circumvent fraud. *Id*.

After the parties submitted briefs in this matter, the Nebraska Supreme Court issued its opinion in *Perkins v. RMR Building Group, supra*. In *Perkins*, the contractor similarly billed and received funds from its customer in advance of performing work on a project. Rather than utilizing all of the advanced funds to work on the project for which it was billed, the contractor diverted certain funds to pay creditors on a different project. And similar to the case at bar, because the contractor ran out of money before finishing the project, it decided to "wind up" its construction company leaving the customer's project unfinished despite the prepayment for unperformed work. In determining whether the actions of the contractor justified piercing the corporate veil of the contractor's corporate entity to impose liability on its shareholder, the court reiterated that piercing the corporate veil is an equitable remedy and that, in an appeal of an equity action, an appellate court tries factual questions de novo on the record and reach a conclusion independent of the findings of the lower court; provided where the credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts over another.

In performing that analysis in *Perkins*, as to the first two elements, the Supreme Court found, on that record, there was no evidence provided of inadequate capitalization when the entity was formed, but the evidence did show the contractor was insolvent at the time it incurred the debt with its customer. As to the third and fourth elements, the Court ultimately concluded that the record did not support equitable piercing. We quote extensively from that analysis because it is somewhat comparable to the record before us. In determining whether the record supported a finding of the diversion of funds for "their own or improper purposes," the Court held:

> The third factor for piercing the corporate veil on the basis of fraud is evidence of a diversion by the shareholder or shareholders of corporate funds or assets to their own or other improper uses. When a principal shareholder appropriates and uses corporate funds and property for the shareholder's personal purposes and thereby defrauds and causes damages to creditors, the shareholder can be held individually liable for corporate debt. The presence of a transaction where corporate funds or assets are diverted to the personal or improper use of a shareholder is not per se fraudulent, but may give rise to an inference of fraud.

*Perkins v. RMR Building Group*, 320 Neb. 707, 720-21, 30 N.W.3d 148, 161 (2026).

The thrust of the plaintiff's argument in *Perkins* was that it constituted fraud for the contractor to use the plaintiff's funds deposited for use on the plaintiff's project to pay other corporate debts. This court agreed with that argument and reversed the district court's

determination that the contractor's use of funds only constituted a prioritization of funds and did not constitute fraud. In reversing this court, the Nebraska Supreme Court held:

> We disagree with the Court of Appeals' finding that Ryan diverted RMR funds for a personal or improper use. The record shows that Ryan never made any such diversions. After RMR deposited the funds provided by Perkins into its general operating account, the funds remained there until they were used to pay for RMR's legitimate business expenses. Ryan's direction to RMR to use its funds for legitimate business expenses did not constitute a diversion of funds for Ryan's personal use or for an improper purpose.

*Perkins*, 320 Neb. at 722, 30 N.W.3d at 162.

As to whether the evidence demonstrated the corporation constituted a facade for the personal dealings of the shareholder, the Supreme Court agreed with determination of the district court and this court that the record lacked evidence that the entity was used as a facade, finding:

> We too agree that there is no evidence in the record that shows RMR was a shell corporation with no legitimate business purpose. The record shows that RMR contracted with clients to serve as a general contractor for construction projects, hired employees to work those projects, paid salaries to those employees, and attempted to make a profit. RMR was not a facade for Ryan's personal dealings, and its operations were not carried on in disregard of its company entity.

*Perkins*, 320 Neb. at 722-23, 30 N.W.3d at 162.

In determining that only one factor, RMR's insolvency, weighed in favor of equitable piercing, the Court in *Perkins* reversed this court and found that corporate veil piercing was not justified on that record. In so doing, the Court noted:

> Because the circumstances or factors to determine the existence of fraud are not usually conclusive proof, but open to explanation, we keep in mind Ryan's explanation for these circumstances when considering the factors present in RMR's case.
>
> Ryan claimed that it was not RMR's insolvency that resulted in its failure to pay for the HVAC equipment; rather, it was RMR's failure to obtain an increase in its line of credit from its bank. This explanation adequately repels the inference of fraud that RMR's insolvency raised, and warrants the conclusion that RMR was not used to perpetrate a fraud or other unjust act.

*Perkins*, 320 Neb. at 723-24, 30 N.W.3d at 163.

When applying the dictates of *Perkins* to the case at bar, we reach a similar result. Like in *Perkins*, the record here reveals there was no evidence of inadequate capitalization of Encore at the time of its inception over a decade ago, but there was sufficient evidence that Encore was insolvent when its debt with Jones was incurred.

But, similar to *Perkins*, the thrust of Jones' argument centers on the third factor to be analyzed in piercing the corporate veil cases, i.e., whether a shareholder diverted corporate funds or assets for their own or improper purposes. Here, Jones makes two arguments in support of his claim. First, he argues that Sleper's diversion of Jones' prepaid funds to pay other corporate debts constitutes evidence of fraud. Second, he argues that Sleper's withdrawal of funds from Encore

while the company was insolvent provides additional evidence of fraud. We will discuss these arguments independently.

First, Jones argues that utilizing his prepaid funds to pay other corporate debts constitutes a diversion of funds for a personal or improper use. The district court agreed finding that this practice "created a ponzi-like scheme in which [Sleper] used funds from new clients to pay bill from old clients in order to keep his corporation solvent." But as we mentioned before, following the entry of the district court's order, the Nebraska Supreme Court released its opinion in *Perkins v. RMR Building Group*, 320 Neb. 707, 30 N.W.3d 148 (2026), in which the Court examined a similar factual scenario. The court disagreed with this court's finding that the utilization of corporate funds deposited by one customer to satisfy corporate debts from another satisfied the diversion factor, holding:

> The record shows that Ryan never made any such diversions. After RMR deposited the funds provided by Perkins into its general operating account, the funds remained there until they were used to pay for RMR's legitimate business expenses. Ryan's direction to RMR to use its funds for legitimate business expenses did not constitute a diversion of funds for Ryan's personal use or for an improper purpose.

*Perkins*, 320 Neb. at 722, 30 N.W.3d at 162.

The same can be said here. After Jones made prepayments to Encore and those funds were deposited in Encore's business account, a portion of the funds were used to pay Encore's other corporate debts. That act did not constitute a diversion of Encore's funds for Sleper's personal use. Instead, those funds were allocated to pay other legitimate corporate debt. As such, that act, standing alone, does not support corporate veil piercing.

Jones argues that, unlike the facts in *Perkins*, some of Encore's funds were diverted for Sleper's personal use. To that end, he argues Sleper withdrew funds from Encore during 2022 and those acts should constitute a fraudulent diversion of corporate funds for personal use. The withdrawals Jones speaks of were depicted on Encore's 2022 corporate tax return. That return, contained within exhibit 1, demonstrates that for the tax year 2022, Sleper received a salary from Encore of $15,790 and net draws of $13,349. As it relates to those corporate withdrawals, the Nebraska Supreme Court held in *J. L. Brock Builders, Inc. v. Dahlbeck*, 223 Neb. 493, 501, 391 N.W.2d 110, 116-17 (1986), *abrogated on other grounds, Perkins v. RMR Building Group, supra*:

> Concerning diversion of corporate funds or assets to the personal or improper use of a shareholder, preventing payment of corporate debts: "Stockholders of an insolvent corporation cannot participate in the distribution of its assets until the claims of creditors are paid. If the assets or capital are distributed to stockholders, either directly or indirectly, or if the stockholders are allowed to withdraw assets leaving creditors unpaid, they may be compelled to repay what they have received, at the suit of creditors . . . at least to the extent necessary to realize the ratable liability of each stockholder for corporate debts, if the company has not retained sufficient assets to pay its debts. . . . The withdrawal of assets leaving debts unpaid is contrary to fundamental principles and has been designated as a fraud on creditors. 15A W. Fletcher, *supra* at § 7417 at 137."

But Jones did not bring an action to recover only the funds withdrawn from Encore while the business was insolvent. Instead, he asks this court to consider Sleper's limited withdrawals as

fraudulent acts which justify piercing the corporate veil so as to hold Sleper personally liable for the entirety of Encore's corporate debt. But as the Nebraska Supreme Court noted in *Perkins*, "[b]ecause the circumstances or factors to determine the existence of fraud are not usually conclusive proof, but open to explanation, we keep in mind [the shareholders'] explanation for these circumstances when considering the factors present in RMR's case." *Perkins v. RMR Building Group*, 320 Neb. 707, 723, 30 N.W.3d 148, 163 (2026). In considering those circumstances and factors in *Perkins*, the Supreme Court held:

> [The shareholders] claimed that it was not RMR's insolvency that resulted in its failure to pay for the [corporate debt]; rather, it was RMR's failure to obtain an increase in its line of credit from its bank. This explanation adequately repels the inference of fraud that RMR's insolvency raised, and warrants the conclusion that RMR was not used to perpetrate a fraud or other unjust act.

*Perkins*, 320 Neb. at 723-24, 30 N.W.3d at 163.

We reach a similar conclusion here. The record reveals that Encore annually paid Sleper a salary and draws for his work associated with the business. Encore's prior tax returns demonstrate this was a customary practice and the net salary and net draws for 2022 were not unusual in amount when considering prior years. When considering Sleper's explanation for making these draws, he explained that he did not foresee suffering a stroke with resulting blood clots which disrupted his ability to continue working and support the business and its debts. In other words, he was taking salary and draws as he ordinarily would because he did not foresee that a medical condition would disrupt his ability to continue to produce revenue for the business as he had before. This explanation adequately repels the inference of fraud associated with Sleper directing Encore to distribute salary and draws in its customary manner despite Encore's financial position. And although we do note that Encore issued two draws totaling $6,883 distributed after July 2022 when Sleper became ill, on balance, we cannot conclude that, standing alone, those withdrawals justify piercing the corporate veil in this context.

As it relates to the final factor, i.e., whether Encore was a facade for Sleper's personal dealings, there was limited evidence on this subject. Similar to *Perkins*, there was evidence that Encore has served as a long-time construction business for over 15 years, successfully performed numerous construction projects, paid its creditors over time, and generated a profit. And neither party placed into the record documentary evidence from Encore's American National Bank account, which Sleper testified was the long-time established business checking account. The sole evidence governing this subject came from Sleper, who testified that he kept the separate business checking account at American National Bank that he utilized to conduct Encore's separate business dealings. In addition, Sleper testified that he incorporated Encore nearly 15 years ago by filing corporate paperwork in the State of Iowa, annually filed separate income tax returns, and that the corporation remained in "good standing" with the Iowa Secretary of State. Sleper generally testified that he did not commingle cash in his business checking account with his personal dealings, and that he had successfully conducted Encore's affairs as a separate business since 2006. In response, Jones provided evidence that Encore failed to exercise certain corporate formalities such as holding annual meetings of shareholders and directors as required by Encore's articles and bylaws. Additionally, Jones directs our attention to a schedule in Encore's 2022 tax return which delineates the withdrawals by Sleper during 2022, which included payments to the "Douglas

County Treasurer," "Diamond Chiropractic," and the "Public School Fund." He argues that these entries are demonstrative that Sleper utilized Encore for personal use.

When reviewing this record in its entirety, there are certain factors that support corporate veil piercing. These factors consist of Encore's insolvency when it incurred its debt to Jones, Sleper's withdrawals during 2022 while Encore was insolvent, and Sleper's lack of exercising certain corporate formalities in conducting the business of Encore such as the failure to hold annual meetings of the board of directors and shareholders as required by the corporate bylaws. But when balancing the factors required by law, this record does not present a scenario where Sleper, who controlled Encore, exercised that control to commit fraud or other wrongdoing in contravention of Jones' rights. Instead, Encore presents as a small, closely held corporation which operated on a small margin, albeit successfully over the course of time, but was ultimately neutralized by the illness of its sole shareholder. That explanation here adequately repels the inference of fraud that Encore's insolvency raised and warrants the conclusion that Encore was not used to perpetrate a fraud or other unjust act. On this specific record and based upon the mandate in *Perkins v. RMR Building Group*, 320 Neb. 707, 30 N.W.3d 148 (2026), we find that the court erred in finding that Encore's corporate veil should be pierced.

## CONCLUSION

Having found that the district court erred in piercing Encore's corporate veil to enter judgment against Sleper personally, we reverse the district court's October 24, 2024, order granting summary judgment in favor of Jones, which found the evidence supported piercing the corporate veil; vacate the district court's April 3, 2025, order finding that Sleper was personally liable in the amount of $336,362.07 plus prejudgment and postjudgment interest, directing the clerk to issue payment to Jones in the amount of $177,565.04 from proceeds from the sale of Sleper's residence, and entering judgment in favor of Jones for the remaining $158,797.03; and remand the cause with directions to enter judgment in favor of Sleper.

REVERSED IN PART, VACATED IN PART,
AND REMANDED WITH DIRECTIONS.