GIFFORD-HILL & COMPANY, INC., A DELAWARE CORPORATION, APPELLEE, V. JACK W. STOLLER AND BETTY M. STOLLER, APPELLANTS.

380 N.W.2d 625

Filed January 31, 1986.   No. 84-831.

Donn C. Raymond of Raymond, Olsen, Ediger & Ballew, P.C., for appellants.

David C. Nuttleman of Holtorf, Kovarik, Nuttleman, Ellison, Mathis & Javoronok, P.C., for appellee.

BOSLAUGH, HASTINGS, SHANAHAN, and GRANT, JJ., and BRODKEY, J., Retired.

SHANAHAN, J.

The district court for Scotts Bluff County entered judgment that real estate conveyances by Jack W. Stoller to his wife, Betty M. Stoller, were fraudulent conveyances made with intent to hinder Gifford-Hill & Company, Inc., a creditor of Jack Stoller. We affirm.

In January 1978 Jack Stoller and David Deines formed

Western Irrigation Systems, Inc. Of Western Irrigation's capital stock, Stoller, as president and sales manager, owned 60 percent and Deines, as secretary-treasurer and general manager, owned 40 percent. Western Irrigation's contemplated business was design, sale, installation, and service of irrigation systems and supplying other products for agricultural use. To commence business, on January 23, 1978, Western Irrigation obtained a loan from the Gering National Bank & Trust Company for $252,000, which was guaranteed by the Small Business Administration. Although Western Irrigation had given the bank a promissory note secured by a mortgage on corporate assets, the bank required additional security for the loan to Western Irrigation, namely, Jack's personal guaranty of Western Irrigation's note, as well as mortgages from Stollers on three of five tracts of real estate owned jointly by Jack and Betty, including the Stoller home. The bank required similar security from Deines.

Late in 1979, when Western Irrigation experienced a "financial crisis," and the bank became "jumpy," officials of the bank and SBA demanded liquidation of Western Irrigation's assets. In January 1980 Western Irrigation went out of business. To forgo foreclosure of mortgages on Stollers' three tracts of real estate and as additional security concerning Jack's guaranty of Western Irrigation's promissory note, the bank requested that Stollers assign their interest in a contract for the purchase of a Wyoming farm. As later testified by Stollers, sometime before January 25, 1980, Jack and Betty reached an oral agreement that Betty would assume responsibility for all Jack's indebtedness on account of his involvement with Western Irrigation, especially any balance of indebtedness to the bank and SBA which might remain after liquidation of Western Irrigation's assets. As a part of that oral assumption agreement, Jack agreed to convey all his real estate to Betty. On January 25 Stollers gave the bank their written assignment of the Wyoming contract. That assignment contained a cancellation provision in the event Western Irrigation's debt was paid to the bank. However, Jack and Betty did not tell anyone about their assumption agreement and did not prepare any memorandum containing such assumption

agreement.

On February 4, 1980, Gifford-Hill filed suit against Western Irrigation to collect an unpaid account for $157,849.09 and named Deines and Jack Stoller as defendants with Western Irrigation. Jack and Deines were joined as defendants due to their personal guaranty regarding Western Irrigation's account with Gifford-Hill. The sheriff, on February 7, served summons in the Gifford-Hill case on Jack Stoller personally at Stollers' home. On February 13, by warranty deed, Jack conveyed his interest in five tracts of real estate, that is, all the real estate owned by Jack and Betty Stoller jointly, to Betty Stoller individually for $1 and "other valuable consideration." Western Irrigation's physical assets were sold at auction on April 23, but the sale resulted in a deficiency concerning the amount owed to the bank. Betty later gave her promissory notes to the bank and SBA concerning that deficiency after liquidation of Western Irrigation's assets. In September 1981 Jack Stoller consented to judgment against him for $157,849.09 in the suit brought by Gifford-Hill. Execution on Gifford-Hill's judgment was issued on January 18, 1982, but returned wholly unsatisfied on February 8, 1982.

On March 23, 1983, Gifford-Hill commenced the present action against Jack and Betty Stoller and sought judgment that each of Jack's five conveyances to Betty on February 13, 1980, be "declared fraudulent and void" regarding Gifford-Hill. In their amended answer Stollers allege that the conveyances to Betty were supported by consideration and were not made with the intent to hinder, delay, or defraud Gifford-Hill. On June 18 Jack filed bankruptcy, naming Gifford-Hill as an unsecured creditor, and was discharged as a bankrupt on December 14.

Evidence adduced at trial showed that on February 13, 1980, Jack owned personal property valued at $21,079 and owed debts of $229,879 excluding the unpaid account involved in Gifford-Hill's pending suit against Jack for $157,849.09. Considering Gifford-Hill's subsequent judgment, Jack's indebtedness, liquidated and contingent, at February 13, 1980, was $387,728.09. The fair market value of the real estate conveyed from Jack to Betty was between $231,000 and $246,000. During trial, Jack testified about the consideration

given by Betty for the five questioned conveyances to her:

> [S]he . . . committed herself to the signing of any notes that would be necessary to cover any anticipated shortages created by the sale of the Western Irrigation Systems corporation assets to the SBA and/or the Gering National Bank. She also agreed to assume all the mortgages on the property and all the underlying promissory notes on those properties.

Betty Stoller testified she first learned of the Gifford-Hill litigation when summons was served on Jack for that lawsuit. "[T]he first I knew of this [Gifford-Hill litigation] is when the papers were brought to the house to Jack." When asked if she knew about Gifford-Hill's lawsuit before the conveyances from Jack, Betty replied, "I guess I didn't realize what the lawsuit was about, I didn't know anything about any of this indebtedness to [Gifford-Hill]."

The trial court found that, before the conveyances to Betty, Stollers knew about the Gifford-Hill action against Jack, Betty did not give adequate consideration for the conveyances from Jack, and, therefore, the conveyances were made with intent to hinder Gifford-Hill's collecting the debt owed by Jack. The court declared the five conveyances void as to Gifford-Hill.

Stollers contend the district court erred in its findings (1) that the conveyances by Jack to Betty were made without adequate consideration and with intent to hinder, delay, or defraud Gifford-Hill, a creditor, and (2) that Betty had notice of Gifford-Hill's claim against Jack, when he conveyed the real estate on February 13, 1980.

An action to declare a conveyance fraudulent as to a creditor invokes equity jurisdiction of a court. *First Nat. Bank v. First Cadco Corp.*, 189 Neb. 553, 203 N.W.2d 770 (1973). On appeal an equitable action for declaration of a fraudulent conveyance is a trial of factual questions de novo on the record, subject to the rule that where credible evidence is in conflict on material issues of fact, the Supreme Court will consider the fact that the trial court observed the witnesses and accepted one version of the facts over another. See *First Nat. Bank v. First Cadco Corp., supra*; cf. *Burton v. Annett*, 215 Neb. 788, 341 N.W.2d 318 (1983) (trial de novo on record in an action for an

injunction). See, also, Neb. Rev. Stat. § 25-1925 (Reissue 1979).

Applicable to the questioned conveyances are Neb. Rev. Stat. §§ 36-401 to 36-409 (Reissue 1978) pertaining to "Conveyances to Defraud Creditors." In pertinent parts the statutes provide:

> Every conveyance or assignment, in writing or otherwise, of any estate or interest in lands, or in goods or things in action, or of any rents or profits issuing therefrom, and every charge upon lands, goods or things in action, or upon the rents and profits thereof, made with the intent to hinder, delay or defraud creditors or persons, of their lawful rights, damages, forfeitures, debts or demands, and every bond or other evidence of debt given, suit commenced, or decree or judgment suffered, with the like intent as against the persons so hindered, delayed or defrauded, shall be void.

§ 36-401.

> The question of fraudulent intent in all cases arising under the provisions of sections 36-401 to 36-409 shall be deemed a question of fact, and not of law, and no conveyance or charge shall be adjudged fraudulent, as against creditors or purchasers, solely on the ground that it was not founded on a valuable consideration.

§ 36-406.

Statutory provisions prohibiting conveyances to defraud creditors have evolved from the concept that a debtor's property was a source from which a creditor should be paid. See *Mohar v. McLelland Lumber Company*, 95 Idaho 38, 501 P.2d 722 (1972). When a debtor intentionally withdrew executable assets from the reach of process, such transactions were characterized as fraudulent to creditors of that debtor. See *Klein v. Rossi*, 251 F. Supp. 1 (E.D.N.Y. 1966). The burden of proof is on a creditor to prove, by clear and convincing evidence, that fraud existed in a questioned transaction. See *Chagnon Lumber Co., Inc. v. DeMulder*, 121 N.H. 173, 427 A.2d 48 (1981). Clear and convincing evidence is "that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved."

*Castellano v. Bitkower*, 216 Neb. 806, 812, 346 N.W.2d 249, 253 (1984); *Tobin v. Flynn & Larsen Implement Co.*, 220 Neb. 259, 369 N.W.2d 96 (1985).

Because intent to hinder, delay, or defraud (§ 36-401), as any other subjective state or mental element, is frequently difficult to establish by direct proof, circumstances surrounding a transaction provide evidence to determine whether fraudulent intent existed at the time of the transaction. *Farmers' & Merchants' Nat. Bank v. Mosher*, 63 Neb. 130, 88 N.W. 552 (1901); *Barnard v. Barnard*, 568 S.W.2d 567 (Mo. App. 1978); *United States v. Leggett*, 292 F.2d 423 (6th Cir. 1961).

Over the years, courts have encountered innumerable instances where a debtor transferred property with intent to defraud a creditor. As courts frequently observed, specific situations produced a probability of fraudulent intent in the transfer. Consequently, certain circumstances became the basis for an inference that a fraudulent conveyance existed. Those circumstances have been called badges, signs, indicators, or indicia of fraud. For example, in *Montana Nat. Bank v. Michels*, _____ Mont. _____, 631 P.2d 1260 (1981), the Montana Supreme Court, construing a question of intent to hinder, delay, or defraud a creditor by a conveyance between husband and wife, expressed:

> " '[B]adges of fraud' . . . are said to be facts which throw suspicion on a transaction, and which call for an explanation. . . . More simply stated, they are signs or marks of fraud. They do not of themselves or per se constitute fraud, but they are facts having a tendency to show the existence of fraud, although their value as evidence is relative not absolute. They are not usually conclusive proof; they are open to explanation. They may be almost conclusive, or they may furnish merely a reasonable inference of fraud, according to the weight to which they may be entitled from their intrinsic character and the special circumstances attending the case. Often a single one of them may establish and stamp a transaction as fraudulent. When, however, several are found in the same transaction, strong, clear evidence will be required to repel the conclusion of fraudulent intent . . ."

The generally recognized badges of fraud are the lack of consideration for the conveyance, the transfer of the debtor's entire estate, relationship between transferor and the transferee, the pendency or threat of litigation, secrecy or hurried transaction, insolvency or indebtedness of the transferor, departure from the usual method of business, the retention by the debtor of possession of the property, and the reservation of benefit to the transferor. 37 Am.Jur.2d *Fraudulent Conveyances*, § 10 at 701.

*Montana Nat. Bank v. Michels, supra* at ____, 631 P.2d at 1263. See *Barnard v. Barnard, supra* ("indicia of fraud" creating an inference of improper motive in a debtor's conveyance).

Although the "badges of fraud" may not be conclusive and may be strong or weak according to the nature and number involved in a particular transaction, concurrence of several such badges provides a strong inference of fraud. See, *United States v. Leggett, supra*; *Barnard v. Barnard, supra*.

In reference to one of the badges of fraud, namely, the transferor-transferee relationship, this court, considering a conveyance by a husband to a wife, held: "A conveyance of real property between husband and wife in Nebraska is presumptively fraudulent as to existing creditors and will be set aside unless the good faith of the transaction is established by a preponderance of the evidence." *First Nat. Bank in Kearney v. Bunn*, 195 Neb. 829, 832, 241 N.W.2d 127, 129 (1976) (citing *Farmers Elevator Co. v. Peck*, 134 Neb. 305, 278 N.W. 499 (1938)). "Among the most common indicia of fraud is the transfer of property by a debtor during the pendency of a suit against him, especially where the transfer renders the debtor insolvent or greatly reduces his estate." *Arnold v. Dirrim*, 398 N.E.2d 442, 446-47 (Ind. App. 1979). Good faith and adequate consideration may be shown to counteract evidence tending to establish that a conveyance is fraudulent. See, *Blair State Bank v. Bunn*, 61 Neb. 464, 85 N.W. 527 (1901); *Lusk v. Riggs*, 70 Neb. 713, 97 N.W. 1033 (1904).

"Good faith," among other characteristics, encompasses an absence or freedom from intent to defraud. See, *Doyle v. Gordon*, 158 N.Y.S.2d 248 (Sup. 1954); *Efron v. Kalmanovitz*,

249 Cal. App. 2d 187, 57 Cal. Rptr. 248 (1967). Consequently, good faith and fraud are mutually exclusive terms; the presence of one excludes the existence of the other in the same subject. A lack of good faith is demonstrated by a transferee's participation in a plan to hinder creditors, even though the transfer may be supported by adequate consideration. *Filley v. Mancuso*, 146 Neb. 493, 20 N.W.2d 318 (1945). See, also, *Smith v. Whitman*, 39 N.J. 397, 189 A.2d 15 (1963); *Swanson v. Fuline Corporation*, 248 F. Supp. 364 (D. Or. 1965). In the case of intent established under § 36-401, consideration given by the grantee or transferee becomes immaterial and does not preclude a finding that a debtor intended to hinder, delay, or defraud a creditor, lest the law approve acquisition of property tainted with fraud. See *Arnold v. Dirrim, supra.* Thus, adequate consideration given by a grantee with fraudulent intent will not sustain a conveyance against a creditor's claim to set aside a transaction pursuant to § 36-401.

In the present case there are several badges of fraud appended to the Stoller conveyances. To place the questioned conveyances in perspective, there is no question that Jack fully understood his ultimate legal liability for payment of Western Irrigation's debt to Gifford-Hill, a liability occurring in the same manner as Jack's liability to the bank—the result of his personal guaranty. Stollers acknowledged the likelihood of further deterioration of Jack's financial condition, such as the possibility that proceeds from Western Irrigation's liquidation would be insufficient to pay the bank. Betty was aware of Jack's financial predicament and its probable consequences, including exposure to foreclosure and, perhaps, the eventual loss of Stollers' home. In that perilous financial environment, Betty took steps to assist Jack, namely, their mutual assignment of the Wyoming contract. All that occurred before the lawsuit by Gifford-Hill. Enter Gifford-Hill and its lawsuit filed on February 4, 1980. Within 1 week after the sheriff had served Jack with summons in the Gifford-Hill litigation, Jack, on February 13, conveyed his five tracts of real estate to Betty. Therefore, when the Gifford-Hill lawsuit was less than 2 weeks old, a fact realized by Betty who had personal knowledge that Jack has been served with summons, Jack disposed of all his

real estate by conveyances to his wife, when he was insolvent, or was rendered insolvent by such conveyances. See *Adler & Sons Clothing Co. v. Hellman*, 55 Neb. 266, 291, 75 N.W. 877, 884 (1898) ("insolvency means that the party . . . in question is unable to pay his debts as they become due in the ordinary course of his daily transactions"). See, also, *Arnold v. Dirrim, supra*.

Fraudulent intent is a question of fact. See § 36-406. We find that the circumstances in this case establish an intent to hinder, delay, or defraud Gifford-Hill by the conveyances on February 13, 1980, between Jack and Betty Stoller. Additionally, fraudulent intent on the part of Stollers precludes good faith in their interspousal conveyances. Nothing in the record negatives Stollers' fraudulent intent as an inference drawn from all the circumstances surrounding the conveyances from Jack to Betty. Thus, we need not assess the adequacy of any consideration concerning the questioned conveyances.

Finally, regarding Stollers' contention that Betty did not have notice of Gifford-Hill's claim against Jack at the time of the conveyances, notice or knowledge was a question of fact resolved against Stollers. Upon our review of the record, we find that Betty did have knowledge of Gifford-Hill's lawsuit against Jack, and when we consider the circumstances and the district court's observation of the witnesses, there is an inference that Betty knew about Jack's indebtedness which was the subject of the Gifford-Hill litigation.

For the foregoing reasons the judgment of the district court is affirmed.

AFFIRMED.