ELI'S, INC., A NEBRASKA CORPORATION, APPELLEE AND CROSS-APPELLANT, V. GEORGE E. LEMEN, JR., APPELLANT AND CROSS-APPELLEE, AND WESTERN PRINTING COMPANY, A NEBRASKA CORPORATION, ET AL., APPELLEES.

591 N.W. 2d 543

Filed March 26, 1999.　No. S-97-1255.

Waldine H. Olson and Amy Sherman LaFollette, of Nolan, Roach, Olson, Fieber & Lautenbaugh, for appellant.

D.C. Bradford, of Bradford, Coenen & Welsh, for appellee Eli's, Inc.

Hendry, C.J., Wright, Connolly, Gerrard, Stephan, McCormack, and Miller-Lerman, JJ.

Stephan, J.

This action involves alleged fraudulent transfers of assets of Western Printing Company (Western) to George E. Lemen, Jr. (Lemen), its principal shareholder and operating officer, and other members of Lemen's family. The action was filed by Eli's, Inc. (Eli's), as the assignee of four of Western's creditors. Following a bench trial, the district court for Douglas County entered judgment in favor of Eli's in the amount of $356,652.96 plus prejudgment interest. Lemen appealed, and Eli's cross-appealed on the ground that the district court erred in not awarding certain additional sums claimed by Eli's. We transferred the appeal to our docket pursuant to our authority to regulate the caseloads of the appellate courts and now affirm the judgment of the district court.

## FACTS

Western was a closely held corporation engaged in the printing business in Omaha. Prior to transfers that occurred in 1993 which are the subject of this action, all of its stock was owned by Lemen and his three children. Western Enterprises II (Western Enterprises) was a partnership, composed of the same Lemen family members, which owned the real estate upon which Western conducted its business. Lemen held a 60-percent interest in the partnership.

Prior to the transfers at issue, Lemen conducted Western's operations and business affairs with the assistance of his son William Todd Lemen. Western experienced annual operating losses beginning in 1989, requiring Lemen to make periodic loans to Western in order to continue its operations. Western was delinquent on its $8,000 monthly rental payments to Western Enterprises for the months of February, March, and April 1993, and Lemen personally paid the mortgage payments of Western Enterprises during these months. Western's accounts payable, as shown by audited reports, increased from approximately $128,872 on June 30, 1991, to $230,611 on June 30, 1992. The record also shows that for several months prior to April 1993, Western did not pay its creditors on a timely basis

and its monthly operating losses had increased to approximately $25,000 per month.

When William Lemen informed Lemen in 1992 that he did not wish to purchase the business or continue its operation on a long-term basis, Lemen sought an outside purchaser. By November 1992, Lemen had signed a "Summary of Understanding and Intent" (summary) with Robert Gittins, whereby Gittins agreed to purchase the stock of Western for a total of $456,000. The summary stated that Lemen would receive $100,000 cash from Gittins and that Western would pay Lemen a secured installment note of $171,000. Western was also to convey to Lemen approximately $100,000, representing the cash value of life insurance policies held by Western, and 4,639 shares of Nebraska National Bank stock that was owned by Western, having an approximate value of $85,000. The summary provided for the payment of 72 monthly payments of $2,400 to Lemen as consideration for a covenant not to compete and stated that a cash advance of $22,262 made by Lemen to Western would be repaid on December 1. The summary further provided that preferred stock owned by Lemen family members would be redeemed by Western at a par value of $12,000. Finally, the summary provided that any rent in arrears as of December 1, 1992, would be paid to Lemen on that date.

In a separate transaction in December 1992, Lemen caused Western to transfer the 4,639 shares of Nebraska National Bank stock to himself in return for a promissory note in the amount of $85,000. This bank stock and the cash value of the life insurance policies had been listed as liquid assets of Western on an audited report of June 30, 1992. There were no liens against any assets of Western at the time of this report. At the time the bank stock was transferred to Lemen, Western needed cash and had unsecured creditors. Lemen never made any payments on the $85,000 note.

Field Paper Company supplied printing paper to Western. In the fall of 1992, Michael Freeland, the president of Field Paper, had several discussions with Lemen regarding Western's delinquency on its account with Field Paper. As a result of these discussions, Lemen provided Freeland with the audited report of Western's financial condition as of June 30, 1992. Freeland tes-

tified that he noticed that the $100,000 life insurance asset and the Nebraska National Bank stock were listed on this report. On behalf of Field Paper, Freeland entered into a workout agreement with Western on March 9, 1993, relying in part upon the existence of these assets which he believed to be unencumbered. On that date, the balance due Field Paper was $86,494.85. Lemen told Freeland that he was in the process of selling Western, but did not disclose the fact that Gittins was the purchaser. Freeland, who understood that the account of Field Paper would be paid in full upon the sale of Western, was acquainted with Gittins and knew that Gittins had financial problems. Freeland testified that he would not have entered into the workout agreement had he known that Western was being sold to Gittins.

During this same time period, Lemen hired an attorney, Dennis Connolly, to prepare documents for the transfer of Western to Gittins and Gittins' wife. William Urban, a certified public accountant, was Western's regular accountant but did little work for Western after preparing the audited report of June 30, 1992. Connolly contacted Urban in early April 1993 and inquired whether Western would have equity after the sale. Initially, Urban told Connolly that he could not answer that question without further analysis of the financial data. However, after arriving at some estimates, Urban and Connolly reached the conclusion that Western would have equity after the anticipated sale to Gittins.

Gittins never made the $100,000 cash payment recited in the summary of understanding. According to Gittins, the original financing was to come from VCG Credit Co. (VCG), but VCG refused to loan Gittins the amount necessary to pay Lemen. For this reason, Gittins, Western, and members of the Lemen family entered into a new agreement on April 15, 1993, which they referred to as a "redemption agreement." It was pursuant to this document that the sale of Western to Gittins was ultimately consummated. Under the redemption agreement, Lemen was to transfer his Western stock to Gittins in exchange for $371,000 in cash plus cancellation of the $85,000 note which he gave to Western when he transferred the Nebraska National Bank stock to himself. Lemen's three children were to receive a total of

$12,000 in exchange for their preferred stock. Lemen was also to receive $2,400 per month for 72 months as a noncompetition agreement and $46,000 to be paid in 48 equal monthly installments as moneys due him from Western. The latter amount included $22,000 which Lemen had previously advanced to Western and $24,000 which Western owed to Western Enterprises for rent.

In order to raise the money which Lemen was to receive for his stock, the redemption agreement provided that Connolly would hold the stock in escrow and authorized Western to sell its assets to VCG for $300,000, with a lease-back provision. The lease provided for monthly payments by Western of approximately $6,072 for a period of 72 months. The redemption agreement also provided that $271,000 would be paid to Lemen from the proceeds of the VCG sale and that $100,000 would come from the cash value of the life insurance policies held by Western. The redemption agreement also stated that Gittins would contribute cash amounts to Western if it did not have sufficient surplus to carry out the payments required in the agreement.

Lemen testified that prior to the sale, he knew little about Gittins' reputation as an individual and did not investigate his background extensively. However, Lemen also stated that he and Gittins had known each other for 20 years; that he was aware that Gittins' business, American Litho Graphic Corporation, had successfully been through chapter 11 bankruptcy; and that he believed Gittins could successfully operate Western. The record indicates that Urban and Lemen believed that Gittins was enthusiastic about purchasing the company and that he had some good ideas for making it into a viable enterprise. Lemen did not obtain updated figures from Urban prior to the sale, but he knew that Western was continuing to lose approximately $25,000 per month in early 1993 and that the accounts payable had risen approximately $100,000 between the time of the audited report of June 30, 1992, and April 1993. Regarding Gittins' ability to fund the stock redemption, Lemen testified that he believed Gittins was an honest man and assumed Gittins would raise the money. Gittins testified that he entered into the redemption agreement because he was desperate to try to save

his own company and he hoped that combining it with Western would create a viable enterprise.

In order to carry out the redemption agreement, a special account was set up at Packers National Bank with Lemen and Gittins as the only signatories. The $300,000 which Western received from VCG for the sale of its equipment was deposited in this account. After $271,000 was paid to Lemen and $12,000 paid to his children for their stock, a balance of $17,000 remained. Pursuant to the redemption agreement, Lemen's $85,000 note to Western was canceled and he was to receive an additional amount of $46,000, representing the funds he had advanced to Western and the rents owed by Western to Western Enterprises. He received three payments on the covenant not to compete, totaling $7,200. Lemen also received the cash value of the life insurance policies that had been owned by Western, although he claims that he received only $80,000 instead of the $100,000 cash value specified in the redemption agreement. Lemen testified that at one point, he offered to permit Gittins to hold the insurance policies and pay the $100,000 to Lemen's estate upon his death, but Gittins declined.

Following execution of the redemption agreement on April 15, 1993, Lemen's son William Lemen continued as the president of Western until approximately October 1993. During this period, Lemen received 22 weekly payments of $500 each and 2 payments of $1,000 each from Western. Lemen testified that this was compensation for work he performed as a consultant, but Gittins testified that these payments were unauthorized. There is some evidence that a portion of the payments may have been payments on the $46,000 for cash advances and back rents which Lemen was to receive pursuant to the redemption agreement. Lemen had been a member of the board of directors of Nebraska National Bank during the period when Western owned stock in the bank. He was aware that during this period, several other banks had made overtures to Nebraska National Bank regarding the purchase of its stock. On May 17, 1993, Lemen sold the Nebraska National Bank stock which Western had transferred to him, realizing $114,120 from this sale.

Gittins operated Western from April 15, 1993, until approximately July 1994, when the business failed. Western Enterprises

evicted Western in late summer of 1994. However, Gittins contends that he was not delinquent on the rent payments to Western, and there is conflicting evidence regarding this issue. The building was sold in October 1994, and the proceeds of the sale were disbursed to the partners of Western Enterprises.

Both Eli's and Lemen presented expert testimony on the issue of Western's financial condition before and after the transfers of Western's assets pursuant to the redemption agreement. Urban, called as a witness on behalf of Lemen, testified that Western was solvent both before and after the 1993 redemption of its stock. Urban admitted that his analysis was not prepared according to "generally accepted accounting principles" (GAAP rules), but stated that GAAP rules were not applicable to the computations he made. On cross-examination, Urban admitted that some of the company assets which he included in his analysis were never received, including the $100,000 which Gittins was to pay under the initial summary. Urban also testified that Western was delinquent on its lease payments to Western Enterprises both before and after April 15, 1993, but that in his opinion, Western could pay its debts as they became due. However, Urban stated that he made this determination based on whether he thought Western was able to pay and not on whether it actually was paying creditors. Urban also conceded that the assets which Western transferred to or for the benefit of Lemen were thereby made unavailable to creditors and that he considered the transfer of the bank stock from Western to Lemen to be outside the ordinary course of Western's business.

Ron Nebbia, a certified public accountant, testified on behalf of Eli's. He expressed his opinion that applying GAAP rules, Western was insolvent both before and after the redemption of April 15, 1993, and that in his opinion, Western did not receive equivalent value for the sale. He testified that the total stockholder equity following the redemption was a negative $265,760.33. Nebbia also testified that after April 15, 1993, Western's previously liquid assets, including its equipment, bank stock, and cash value of life insurance, were no longer assets of Western which could be used to pay unsecured creditors and that VCG and Lemen were in secured positions with

priority over Western's unsecured creditors. Nebbia stated that Lemen received a value of $645,118.49 in connection with the redemption and that after the redemption, it was virtually impossible for Western to meet its obligations as they became due.

Dennis Hein, a certified public accountant, also testified for Eli's. In Hein's opinion, Western's liabilities exceeded its assets by approximately $70,000 after the redemption. Hein also stated an opinion that Western was unable to meet its obligations on a timely basis after March 31, 1993. Hein testified regarding inaccuracies in the data upon which Urban based his opinions and stated that there was no legitimate reason for Western to enter into the redemption agreement because the value of the assets received by Lemen far exceeded the value of the stock received by Western. He further stated that the postredemption assets of Western were not sufficient for it to remain in business. Hein agreed with Nebbia that Western was insolvent after the redemption and that it could not pay its current liabilities.

Robert Kirchner, a certified fraud expert, testified that Lemen was an "insider" with respect to Western, as that term is used in the Uniform Fraudulent Transfer Act, Neb. Rev. Stat. § 36-701 et seq. (Cum. Supp. 1992). Kirchner stated that virtually all of Western's assets were transferred under the redemption agreement and that there was no evidence the transfers were disclosed to creditors. However, Kirchner admitted that the VCG sale/lease-back transaction did include a public filing pursuant to the Uniform Commercial Code.

Eli's operated a prepress business in Omaha. Eli's, then a proprietorship, engaged Dana Bradford in 1992 for assistance with its bankruptcy proceedings. The bankruptcy was dismissed, but Eli's continued having financial difficulties. Bradford subsequently incorporated Eli's and became a minority stockholder. In 1994, Bradford pursued the possibility of merging Eli's prepress operations with Western's printing business. When Western ceased its operations in July 1994, Bradford negotiated the acquisition of its printing equipment. As a part of this transaction, Eli's took assignments of the claims of several of Western's unsecured creditors, including Diamond Die Company, Carpenter Paper Company, Field

Paper, and VCG. The combined amount of the assigned claims was approximately $282,040. Eli's paid a total of $33,863.56 for the assignments.

Asserting its interest as the assignee of Western's creditors, Eli's commenced this action on March 3, 1995, naming as defendants Lemen; his three children, George Lemen III, William Lemen, and Gail A. Lemen; Western; and Western Enterprises. Eli's prayed for judgment against Western on the indebtedness represented by the assigned claims and also sought judgment against Lemen and his children on the theory that assets of Western which they received under the 1993 redemption agreement constituted fraudulent transfers as defined in the Uniform Fraudulent Transfer Act.

On May 12, 1995, while this action was pending, the four claims were assigned by Eli's to DCB, Inc., a corporation of which Bradford is the president. The record does not reflect a motion by any party to substitute DCB for Eli's as the party plaintiff.

On October 10, 1995, Eli's obtained a default judgment on its claim against Western in the amount of $356,652.96. Subsequently, it filed its fourth amended petition in which it alleged its status as a judgment creditor of Western. In count I of its fourth amended petition, Eli's alleged violations of the Uniform Fraudulent Transfer Act. Count II alleged the improper receipt by Lemen of 4,639 shares of stock of the Nebraska National Corporation in exchange for a promissory note of $85,000. Count III alleged a double payment of rent from Western. Count IV sought a constructive trust in favor of Eli's, and count V alleged that the defendants were liable for the amount of the judgment due to violations of the Business Corporation Act. In his answer, Lemen generally denied the allegations and further alleged that counts I, II, III, and IV failed to state a claim upon which relief could be granted. Lemen also alleged that certain allegations made by Eli's were frivolous and sought attorney fees and court costs. In its reply, Eli's alleged that certain allegations in the answer were frivolous.

Following a bench trial on the fourth amended petition, the district court for Douglas County entered an order which included specific findings of fact. The district court concluded

that Western had sustained operating losses for several years prior to the transfer of its assets. The court further determined that Freeland, as president of Field Paper, would not have entered into a workout agreement if there had been a disclosure of the transfer of Nebraska National Bank stock and life insurance proceeds to Lemen. The court noted that if Gittins had injected $100,000 into Western pursuant to the original summary, the entire transaction "might have been more palatable." However, in light of the redemption agreement, the court stated that the transaction was "totally one sided," with the net effect of the agreement allowing Lemen and his family to take virtually all of Western's liquid assets, leaving Western without cash and with nearly all of its few remaining assets encumbered. The court further noted that the transaction immediately caused Western to incur a 72-month lease with payments of $6,070.50 per month in addition to the substantial losses that Western sustained on a regular basis. Noting that Urban did not utilize GAAP rules in arriving at his opinion of solvency, the district court placed credence in Eli's evidence that Western was insolvent both before and after the redemption. The court further concluded that Western was not paying its creditors on a timely basis. In regard to the Nebraska National Bank stock, the court concluded that Lemen paid inadequate consideration for it because he was "keenly aware" of the opportunity that the bank would be acquired at a higher price in the near future.

Based on these findings, the district court concluded that the transfers of Western's assets to Lemen were fraudulent pursuant to the Uniform Fraudulent Transfer Act, § 36-705(a)(1) and (2), both as transfers made "'with actual intent to hinder, delay or defraud'" creditors and as transfers made "without receiving a reasonably equivalent value in exchange for the transfer or obligation." The district court also concluded that the claims based upon violation of the Business Corporation Act were proved. However, the court denied Eli's claims regarding double payment of rent and the request for an imposition of a constructive trust. Noting that the findings were directed almost solely to the actions of Lemen, the court entered judgment against only Lemen in the amount of $356,652.96 plus interest. The district court denied Eli's claim for attorney fees.

## ASSIGNMENTS OF ERROR

Lemen assigns as error, reordered, that (1) the trial court lacked jurisdiction; (2) the assignments from Western's creditors to Eli's are void and against public policy; (3) the evidence was insufficient to support a finding that Lemen violated the Uniform Fraudulent Transfer Act; (4) the court failed to consider the actions or inactions of Gittins, which were the proximate cause of the insolvency of Western following the redemption; and (5) the court failed to apply principles of equity in assessing the actual amount of Eli's damages.

On cross appeal, Eli's assigns that (1) the trial court erred in failing to find that Lemen had improperly taken money from Western and (2) the trial court erred in failing to sanction Lemen for filing a frivolous pleading.

## STANDARD OF REVIEW

An appeal of a district court's determination that transfers of assets were in violation of the Uniform Fraudulent Transfer Act is equitable in nature. *Dillon Tire, Inc. v. Fifer, ante* p. 147, 589 N.W.2d 137 (1999); *Wolf v. Degner*, 243 Neb. 702, 502 N.W.2d 440 (1993). In an appeal of an equity action, an appellate court tries factual questions de novo on the record, reaching a conclusion independent of the findings of the trial court, provided, however, that where credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Cheloha v. Cheloha*, 255 Neb. 32, 582 N.W.2d 291 (1998).

The determination of a jurisdictional issue which does not involve a factual dispute is a matter of law which requires an appellate court to reach its own conclusions independent from the trial court. *Rice v. Adam*, 254 Neb. 219, 575 N.W.2d 399 (1998).

## ANALYSIS

### JURISDICTION

Lemen contends that the district court lacked jurisdiction because DCB, not Eli's, was the real party in interest. Neb. Rev.

Stat. § 25-301 (Reissue 1995) provides that subject to an exception not involved in this case, "[e]very action must be prosecuted in the name of the real party in interest . . . ." See, also, *State on behalf of Hopkins v. Batt*, 253 Neb. 852, 573 N.W.2d 425 (1998); *Krohn v. Gardner*, 248 Neb. 210, 533 N.W.2d 95 (1995); *Misle v. Misle*, 247 Neb. 592, 529 N.W.2d 54 (1995). "The assignee of a thing in action may maintain an action thereon in his own name and behalf, without the name of the assignor." Neb. Rev. Stat. § 25-302 (Reissue 1995). Accord *Krohn v. Gardner, supra.*

> To determine whether a party is a real party in interest, the focus of the inquiry is whether that party has standing to sue due to some real interest in the cause of action, or a legal or equitable right, title, or interest in the subject matter of the controversy.

*Misle*, 247 Neb. at 596, 529 N.W.2d at 58. "The purpose of the inquiry is to determine whether the party has a legally protectable interest or right in the controversy that would benefit by the relief to be granted." *Id.* We have said that "[t]he assignee of a chose in action is the proper and only party who can maintain the suit thereon." *Krohn v. Gardner*, 248 Neb. at 214, 533 N.W.2d at 98.

The question of whether a party who commences an action has standing and is therefore the real party in interest is jurisdictional. *Rice v. Adam, supra.* Lemen argues that the assignments from Western's creditors to Eli's were contrary to public policy and therefore void. Although the record does not reflect that this issue was raised in the district court, we address it on appeal because if the assignments were void, Eli's could not have been the real party in interest when it commenced this action, and neither the district court nor this court would have subject matter jurisdiction.

Lemen first argues that the assignments should be held void under an extension of our cases holding that an assignment of a legal malpractice claim is contrary to public policy and therefore void in its entirety. See, *Community First State Bank v. Olsen*, 255 Neb. 617, 587 N.W.2d 364 (1998); *Earth Science Labs. v. Adkins & Wondra, P.C.*, 246 Neb. 798, 523 N.W.2d 254 (1994). The holding in these cases is an exception to the general

rule, recognized in *Schupack v. McDonald's System, Inc.*, 200 Neb. 485, 488-89, 264 N.W.2d 827, 829 (1978), quoting 6A C.J.S. *Assignments* § 29 (1975), that " '[s]ubject to certain exceptions in case of contracts involving relations of personal confidence or trust or being for personal services all contracts are assignable.' " In *Earth Science Labs. v. Adkins & Wondra, P.C.*, 246 Neb. at 802, 523 N.W.2d at 257, we reasoned that legal malpractice claims were not assignable "because of public policy considerations concerning the personal nature and confidentiality of the attorney-client relationship."

There is nothing in the record to suggest that the claims assigned to Eli's involve "personal services" or "personal confidence and trust" of the nature found in the attorney-client relationship. The assigned claims relate to the unpaid balances of general commercial accounts, not contracts for personal services, and the fact that the assignee seeks to recover under a theory of fraudulent transfer does not alter the nature of the underlying contractual indebtedness.

Although Lemen cites cases from other jurisdictions holding that a cause of action for fraud is personal and therefore not assignable, our law is otherwise. We held in *Stroman v. Atlas Refining Corporation*, 112 Neb. 187, 199 N.W. 26 (1924), that an action in tort for fraud survives in this state and is assignable. Although we have not had previous occasion to do so, other jurisdictions have specifically held that a cause of action seeking to set aside a fraudulent transfer is assignable. *Coleman v. Daniel*, 253 S.C. 363, 170 S.E.2d 665 (1969); *Webb v. Pillsbury*, 23 Cal. 2d 324, 144 P.2d 1 (1943).

In *Webb v. Pillsbury, supra*, the plaintiff sued as the assignee of an estate administrator's statutory right to set aside conveyances made by the decedent in fraud of creditors. The Supreme Court of California noted that " 'assignability of things [in action] is now the rule; nonassignability, the exception; and this exception is confined to wrongs done to the person, the reputation, or the feelings of the injured party.' . . ." *Id.* at 327, 144 P.2d at 3. The court specifically held that a creditor may assign a right of action to set aside a fraudulent conveyance. *Id.*

Likewise, in *Coleman v. Daniel, supra*, it was argued that an action based upon a fraudulent conveyance could not be

assigned on the basis of public policy. The Supreme Court of South Carolina quoted the following passage from 37 Am. Jur. 2d *Fraudulent Conveyances* § 146 (1968):

> "The benefit of a fraudulent conveyance statute may be claimed by one who stands in the place of, and has succeeded to the rights of, the creditor, such as, for example, an assignee of the debt which was owed by the transferor. Suit may be maintained by the assignee even though he purchased the judgment against the transferor subsequently to the execution of the conveyance which is sought to be set aside."

*Coleman v. Daniel*, 253 S.C. at 366, 170 S.E.2d at 667. Accordingly, the court held that the assignment did not violate public policy. We reach the same conclusion.

Having determined that the assignments from Western's creditors to Eli's were not void, we find there can be no dispute that Eli's was a real party in interest when it filed this action in March 1995. At this time, Eli's was the assignee as shown on the assignment documents included in the record. Lemen argues, however, that the district court lost jurisdiction when Eli's interests were assigned to DCB in May 1995. This issue is governed by Neb. Rev. Stat. § 25-322 (Reissue 1995), which provides:

> An action does not abate by the death or other disability of a party, or by the transfer of any interest therein during its pendency, if the cause of action survive or continue. In the case of the death or other disability of a party, the court may allow the action to continue by or against his representative or successor in interest. In case of any other transfer of interest, the action may be continued in the name of the original party; or the court may allow the person to whom the transfer is made to be substituted in the action.

In applying § 25-322, we have held that "the transfer of interest after the action is commenced does not prevent the action from being continued to final termination in the name of the original plaintiff." *Exchange Elevator Company v. Marshall*, 147 Neb. 48, 54, 22 N.W.2d 403, 407 (1946), citing *Vogt v. Binder*, 76 Neb. 361, 107 N.W. 383 (1906). Further, this court

has held that where promissory notes which were the subject of an action were transferred during its pendency, the action could continue in the name of the original holder of the notes. *Commercial Nat. Bank v. Faser*, 99 Neb. 105, 155 N.W. 601 (1915). See, also, *Burns v. Hockett*, 91 Neb. 546, 136 N.W. 348 (1912) (when suit was properly commenced by mortgagees, it was properly prosecuted in their names as plaintiffs to final decree, even though they transferred their interest in security and in cause of action).

We find no merit in Lemen's argument that Eli's or DCB was required by § 25-322 to move for substitution of parties following assignment of Eli's interest to DCB in order to preserve the jurisdiction of the district court over the subject matter of this action. It is undisputed that DCB acquired its interest *after* the action was commenced. In this circumstance, the plain language of § 25-322 permits the action to continue either in the name of the original plaintiff or in the name of the transferee of the original plaintiff's interest. We find nothing in the statute or in our jurisprudence which would require substitution of parties in order to preserve jurisdiction under these circumstances. If Lemen believed that substituting DCB for Eli's was in his interest, it was his burden to move for substitution under § 25-322. His failure to do so constituted a waiver of any objection based upon an alleged defect of parties. See *Armbruster v. Stanton-Pilger Drainage Dist.*, 203 Neb. 772, 280 N.W.2d 72 (1979).

### FRAUDULENT TRANSFER

We now turn to Lemen's contention that the evidence was insufficient to support the district court's finding that he violated the Uniform Fraudulent Transfer Act. The record reflects that the action was tried on the theory that the transfers from Western to Lemen as part of the redemption agreement were fraudulent as to present and future creditors under § 36-705, which provides:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or

(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(ii) intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

(b) In determining actual intent under subdivision (a)(1) of this section, consideration may be given, among other factors, to whether:

(1) the transfer or obligation was to an insider;

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) the transfer or obligation was disclosed or concealed;

(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) the transfer was of substantially all the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

As used in this section, "transfer" means "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance." § 36-702(12). A "creditor" is

defined as "a person who has a claim," and a "debtor" is "a person who is liable on a claim." § 36-702(4) and (6). With respect to a corporate debtor, the act defines an "insider" as including a director, officer, or person in control of the debtor, as well as a relative of such person. § 36-702(7)(ii)(A),(B),(C), and (G). Section 36-704 defines "value" as follows:

> (a) Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied, but value does not include an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person.

> (b) For the purposes of subdivision (a)(2) of section 36-705 and section 36-706, a person gives a reasonably equivalent value if the person acquires an interest of the debtor in an asset pursuant to a regularly conducted, noncollusive foreclosure sale or execution of a power of sale for the acquisition or disposition of the interest of the debtor upon default under a mortgage, deed of trust, or security agreement.

> (c) A transfer is made for present value if the exchange between the debtor and the transferee is intended by them to be contemporaneous and is in fact substantially contemporaneous.

A debtor is considered "insolvent" under the act "if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation." § 36-703(a). "A debtor who is generally not paying his or her debts as they become due is presumed to be insolvent." § 36-703(b). See, also, *Dillon Tire, Inc. v. Fifer, ante* p. 147, 589 N.W.2d 137 (1999) (discussing provisions of Uniform Fraudulent Transfer Act).

Section 36-705(b) provides that factors in addition to those enumerated therein may be considered in determining actual intent under § 36-705(a)(1). We have characterized the common law indicia of fraud as follows:

> " ' " "Badges of fraud' . . . are said to be facts which throw suspicion on a transaction, and which call for an explanation. . . . More simply stated, they are signs or marks of fraud. They do not of themselves or per se con-

stitute fraud, but they are facts having a tendency to show the existence of fraud, although their value as evidence is relative not absolute. They are not usually conclusive proof; they are open to explanation. They may be almost conclusive or they may furnish merely a reasonable inference of fraud, according to the weight to which they may be entitled from their intrinsic character and the special circumstances attending the case. Often a single one of them may establish and stamp a transaction as fraudulent. When, however, several are found in the same transaction, strong, clear evidence will be required to repel the conclusion of fraudulent intent . . . ." ' "

. . . .
. . . " 'The generally recognized badges of fraud are the lack of consideration for the conveyance, the transfer of the debtor's entire estate, relationship between transferor and the transferee, the pendency or threat of litigation, secrecy or hurried transaction, insolvency or indebtedness of the transferor, departure from the usual method of business, the retention by the debtor of possession of the property, and the reservation of benefit to the transferor. . . .' "
*Schall v. Anderson's Implement,* 240 Neb. 658, 664-65, 484 N.W.2d 86, 91 (1992). Accord *Gifford-Hill & Co. v. Stoller,* 221 Neb. 757, 380 N.W.2d 625 (1986).

In an action seeking to set aside a fraudulent transfer, the burden of proof is on a creditor to prove, by clear and convincing evidence, that fraud existed in a questioned transaction. *Dillon Tire, Inc. v. Fifer, supra; Gifford-Hill & Co. v. Stoller, supra.* Clear and convincing evidence is " ' "that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved." ' " *Dillon Tire, Inc. v. Fifer, ante* at 155, 589 N.W.2d at 142. Accord *Gifford-Hill & Co. v. Stoller, supra.*

Based upon our de novo review of the record, we conclude that there is clear and convincing evidence that the transfers of assets made in conjunction with the redemption agreement were fraudulent as to the creditors whose claims were assigned to Eli's. With respect to § 36-705(a)(1), it is clear that Lemen was an "insider" as defined by the Uniform Fraudulent Transfer Act

at the time of the transfers and was directly involved in the operation of Western both before and after the transfers. We are persuaded by the testimony of Nebbia and Hein that Western was insolvent both before and after the transfers were made. However, before the transfer of the Nebraska National Bank stock to Lemen and the additional transfers which resulted from the 1993 redemption agreement, Western had unencumbered liquid assets which included the bank stock, the cash value of life insurance policies, and its printing equipment. As a result of the transfers, Western retained virtually no assets and incurred a substantial new obligation in connection with the lease of the printing equipment which it had formerly owned. This sale/lease-back transaction resulted in the transfer of Western's essential business assets to VCG, with the cash proceeds flowing to Lemen under the redemption agreement. Western retained possession of the equipment but, through the sale/lease-back arrangement, placed it out of the reach of its unsecured creditors. There is also evidence that when negotiating a workout agreement with Freeland, Lemen was less than candid regarding his plans to enter into the transaction with Gittins and did not disclose the transfer to himself of the bank stock and insurance assets shown on Western's balance sheet. We are persuaded by the testimony of Nebbia and Hein, as well as other evidence, that Western did not receive reasonably equivalent value for the assets transferred.

Based upon our de novo review, we agree with the district court's finding that other members of Lemen's family were not shown to have been responsible for the fraudulent transfers. The judgment was therefore properly entered solely against Lemen, as he was the "person for whose benefit the transfer was made." See § 36-709(b)(1). Pursuant to § 36-709(b), a creditor may recover judgment for the value of the asset transferred or the amount necessary to satisfy the creditor's claim, whichever is less. The assets which we find to have been fraudulently transferred to Lemen include proceeds from the sale of Western's equipment to VCG, the life insurance policies and bank stock owned by Western as shown on its audited report of June 30, 1992, and the periodic cash payments made to Lemen by Western following redemption of his stock. The evidence estab-

lishes that the combined value of these assets exceeded the amount of the judgment against Western obtained by Eli's.

## ACTS AND OMISSIONS OF GITTINS

Lemen assigns as error the failure of the district court to find that acts or omissions on the part of Gittins were the cause of Eli's damages, but does not cite any authority recognizing that the liability of one who fraudulently transfers assets can be diminished by the conduct of a third party. Lemen argues that Gittins failed to make a cash payment of $100,000 as stipulated in the summary as a part of the purchase of Western. However, the record clearly reflects that this failure occurred *before* Western's assets were transferred. Knowing that Gittins was unable to make the cash payment required under the parties' original summary, Lemen nevertheless entered into the 1993 redemption agreement pursuant to which the assets of Western were transferred to Lemen for his own financial benefit. Further, we note that under the analyses of Eli's expert witnesses, which we find persuasive, Western would have been insolvent following the transfer even if Gittins had made the cash payment under the parties' original summary. Based upon our de novo review, we conclude that this assignment of error lacks merit.

## EQUITABLE REDUCTION OF DAMAGES

Lemen argues that under equitable principles, the amount of damages should be reduced to the amount of the "actual outlay" to Eli's or DCB in connection with the acquisition of the rights of Western's creditors, which he argues to be "in the neighborhood of $115,000.00 and $135,000.00." Brief for appellant at 30. In support of this argument, Lemen relies upon § 36-709(c), which provides that a judgment resulting from a fraudulent transfer based upon the value of the asset transferred "must be for an amount equal to the value of the asset at the time of the transfer, subject to adjustment as the equities may require." However, he cites no authority holding that an assignee's right to recover on an assigned claim is limited, by equitable principles or otherwise, to the amount paid for the assignment.

As a general rule, an assignment is a transfer vesting in the assignee all of the assignor's rights in property which is the sub-

ject of the assignment. *Ehlers v. Perry*, 242 Neb. 208, 494 N.W.2d 325 (1993). While we have not addressed the specific issue, other courts have held that an assignee may recover the full value of an assigned claim regardless of the consideration paid for the assignment. See, *Aetna Casualty & Surety Co. v. McCullough*, 341 N.Y.S.2d 424, 41 A.D.2d 161 (1973); *Leavenworth S. Bank v. Wenatchee V. F. Exc.*, 118 Wash. 366, 204 P. 8 (1922). We find nothing in the record which would support Lemen's contention that the assignments of unliquidated claims to Eli's or DCB at discounted values constituted "inequitable conduct." We conclude that this assignment of error is without merit.

## CROSS-APPEAL

In its cross-appeal, Eli's contends that the district court erred in failing to find that Western made certain unauthorized payments to Lemen and Western Enterprises following the stock redemption and in failing to award attorney fees pursuant to Neb. Rev. Stat. § 25-824 (Reissue 1995) on the ground that Lemen had made certain allegedly "frivolous" assertions in his pleadings. Based upon our review of the record, we conclude that the assignments of error set forth in the cross-appeal are without merit.

## CONCLUSION

Based upon our independent review of the issues of law raised in this appeal and our de novo review of the issues of fact, we find no error by the district court and therefore affirm its judgment.

AFFIRMED.